# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

IN RE: HARDIEPLANK FIBER CEMENT
SIDING LITIGATION

Case No. 12-md-2359
MDL No. 2359

THIS DOCUMENT RELATES TO:

**MEMORANDUM OF LAW &
ORDER**

HEIDI PICHT, Civil File No. 11-958 (MJD/LIB)
THE SUSAN S. BUCHANAN PERSONAL
RESIDENCE TRUST, Civil File No. 12-1393 (MJD/LIB)
JAMES DILLINGHAM, Civil File No. 12-1496 (MJD/LIB)
HUGH FENWICK, Civil File No. 12-1391 (MJD/LIB)
MICHAEL SWIENCKI, Civil File No. 12-1392 (MJD/LIB)
MARK KOSTOS, Civil File No. 12-1497 (MJD/LIB)
JONATHAN BOWERS, Civil File No. 12-727 (MJD/LIB)
RICHARD TREECE, Civil File No. 12-1669 (MJD/LIB)
MASOUD KAVIANPOUR, Civil File No. 12-2268 (MJD/LIB)
JOHN BROWN, Civil File No. 12-2817 (MJD/LIB)
BRIAN BETHEL, Civil File No. 12-2728 (MJD/LIB)
DAVID AND SHARON ANGELICI, Civil File No. 14-285 (MJD/LIB)
JOHN J. HERNANDEZ, Civil File No. 14-4655 (MJD/LIB)

---

Robert K. Shelquist, Karen Hanson Riebel, and Scott Moriarity, Lockridge Grindal Nauen, PLLP, Plaintiffs' Lead Counsel, and Charles J. LaDuca, Cuneo Gilbert & LaDuca, LLP; Charles E. Schaffer, Levin, Fishbein, Sedran & Berman; Clayton D. Halunen, Melissa Wolchansky, Amy E. Boyle, and Christopher J. Moreland, Halunen Law; Michael McShane, Audet & Partners, LLP; Nicholas J. Drakulich, The Drakulich Firm; D. Michael Campbell, Campbell Law; Lawrence Deutsch, Shannon J. Carson, Robin Switzenbaum, and Jake Polakoff, Berger & Montague PC; and Frances Baillon and Shawn J. Wanta, Baillon Thome Jozwiak & Wanta LLP, Plaintiffs' Executive Committee.

1

Christopher M. Murphy, Peter B. Allport, and Daniel Campbell, McDermott Will & Emery LLP; and Aron J. Frakes and Rachna B. Sullivan, Fredrikson & Byron, PA; Counsel for Defendant James Hardie Building Products Inc.

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment (Swiencki) [Docket No. 306]; Defendant's Motion for Summary Judgment (Kavianpour) [Docket No. 311]; Defendant's Motion for Summary Judgment (Susan S. Buchanan Personal Residence Trust) [Docket No. 316]; Defendant's Motion for Summary Judgment (Dillingham) [Docket No. 320]; Defendant's Motion for Summary Judgment (Fenwick) [Docket No. 324]; Defendant's Motion for Summary Judgment (Brown, Kostos, Treece) [Docket No. 328]; Defendant's Motion for Summary Judgment (Bethel) [Docket No. 333]; Defendant's Motion for Summary Judgment (Bowers) [Docket No. 337]; Defendant's Motion for Summary Judgment (Hernandez) [Docket No. 341]; and Defendant's Motion for Summary Judgment (Angelicis) [Docket No. 346].  The Court heard oral argument on December 15 and 16, 2016.  Also before the Court is Defendant's Combined Motion for Summary Judgment and to Dismiss under Rule 9(b) (Picht) [Civil File No. 11-958 Docket No. 25].

## II.    BACKGROUND

### A.    Factual Background

2

### 1.    Overview of the Hardieplank Product

Defendant James Hardie Building Products Inc. ("Hardie") originated in

Australia in 1888, but now sells fiber-cement products around the world.

([Docket No. 260] Moriarity Decl., Ex. B, Exponent Report at 6.)  Fiber-cement is a

composite material made of sand, cement, and cellulose fibers.  (Id.)  Hardie first

began selling its exterior fiber-cement siding, Hardieplank, in the United States

in 1987.  (Id.)  Since that time, Hardie has made at least seven major changes to

Hardieplank, including changing formula additives, design changes (such as

altering the shape of the planks to improve water shedding), and manufacturing

method improvements.  (Id. 18-20.)  Some Hardieplank versions are sold with

Hardie's factory-coated paints, while other versions are sold as primed-only

products, which can be painted either in a factory or in the field.  (Id. at 14-16.)

### 2.    The Hardieplank Warranty

Until 2009, Hardie provided a 50-year prorated limited warranty with

Hardieplank ("Limited Warranty").  (Exponent Report at 6; [Docket No. 273]

Allport Decl., Ex. 4, Limited Warranty.)  The Limited Warranty warrants that

Hardieplank complies with ASTM C1186, the American Society for Testing and

Materials standard, when manufactured and "is free from defects in material and

manufacture."  (Limited Warranty § 1.)  With regard to freeze-thaw resistance in

exterior fiber-cement products, ASTM C1186 provides:

> The specimens, when tested in accordance with Test Method C1185
> [], for 50 [freeze-thaw] cycles, shall not show visible cracks or
> structural alteration such as to affect their performance in use.  The
> ratio of retained strength as calculated from the [flexural strength]
> test results shall be at least 80%.

([Docket No. 273] Allport Decl., Ex. 6, ASTM C1186 § S.7.)

The Limited Warranty also states that, when "properly installed and

maintained according to Hardie's published installation instructions, the Product

for a period of 50 years from the date of purchase . . . will not crack, rot or

delaminate."  (Limited Warranty § 1.)

The Limited Warranty extends to the first retail purchaser of the siding, the

first owner of the structure to which the siding is applied, and the first transferee

of the structure.  (Limited Warranty § 1.)  The Limited Warranty excludes

coverage for performance of any third-party paints, stains, or coatings applied to

Hardieplank.  (Limited Warranty § 3.)  The Limited Warranty also excludes from

coverage damage or defects resulting from "any cause other than manufacturing

defects attributable to Hardie."  (Id.)

As for a remedy, the Limited Warranty provides:

If during the Warranty period, any Product proves to be defective, Hardie, in its sole discretion, shall replace the defective Product before it is installed, or, during the first year, reimburse the covered person for resulting losses up to twice the retail cost of the defective portion of the Product. During the 2nd through the 50th year, the warranty payment shall be reduced by 2% each year such that after the 50th year no warranty shall be applicable. If the original retail cost cannot be established by the covered person, the cost shall be determined by Hardie in its sole and reasonable discretion. Hardie's replacement of the defective Product or granting of a refund pursuant to Section 1 of this Warranty SHALL BE THE SOLE EXCLUSIVE REMEDY available to the covered person with respect to any defect. Hardie will not refund or pay any costs in connection with labor or accessory materials.

(Limited Warranty § 1.)

### 3.    Alleged Defects in Hardieplank Siding

Hardieplank is manufactured using the Hatschek process, in which a roller applies multiple fiber-cement layers or "laminas." (Exponent Report at 7-8.) When the laminas in the substrate separate, the board "delaminates."

Plaintiffs claim that Hardieplank has a common design defect of low interlaminar bond ("ILB") strength, which makes it easier for moisture to invade the substrate and push the laminas apart, causing delamination and coating adhesion problems. They further claim that Hardieplank has design defects causing gapping, warping, cracking, and fading or discoloration. They assert that Hardieplank fails prematurely before its expected life.

### 4. Warranty Claims

From 2001 through 2015, Hardie sold billions of square feet of Hardieplank in the United States and received warranty claims on a very small percentage of the siding sold. ([Docket No. 273] Allport Decl., Ex. 8, Sealed Priest Report at 20.)

Plaintiffs' experts opined that, based on warranty claims, delamination was the primary cause of Hardieplank failure and that such failures occurred more often in cold, wet conditions. (Exponent Report at 48, 57; Moriarity Decl., Ex. 13, Steffey Dep. 71.)

### 5. Hardie's Advertising

In 2000, Hardie was reaching 32 million consumers through its advertising. (Moriarity Decl., Ex. 23, 2000 HardiAdvantage Alliance Training Manual at 649.) In 2000 and 2002, Hardie advertised in several major home-living magazines, in newspapers, on the radio, and on television; it also conducted one-on-one presentations with marketing and management teams for dealers and builders throughout the United States. (Id.; Moriarity Decl., Ex. 24, 2002 Sweet's Catalog Hardie Advertisement at 95.) Hardie's marketing strategy used intermediaries to transmit its representations about Hardieplank to consumers through

cooperative marketing.  (See Moriarity Decl., Ex. 27, 2004 Hardie Factory Build

Housing Handbook at 790-91.)

A 1997 Hardie advertisement stated that Hardieplank is "low

maintenance," "resists moisture damage," "won't crack, rot or delaminate," and

"offer[s] a lifetime of low maintenance backed by a 50-year product warranty"

(Moriarity Decl., Ex. 28, 1997 Hardiplank Hardipanel Brochure at 514-15.)  In

2000-2004, it advertised that Hardieplank was "backed with a 50-year limited

transferable warranty" and asserted that Hardieplank is "low maintenance,"

"resists moisture damage," "won't crack, rot or delaminate," or other similar

statements.  (See, e.g., Moriarity Decl., Ex. 29, 2000 Hardie Siding Brochure;

Moriarity Decl., Ex. 30, 2001 Hardie Advertisement; Moriarity Decl., Ex. 31, 2001

Hardie Brochure; Moriarity Decl., Ex. 32, 2002 Hardie Brochure; Moriarity Decl.,

Ex. 34, 2003 Sweets Catalog Hardie Advertisement; Moriarity Decl., Ex. 35, 2004

Sweets Catalog Hardie Advertisement.)  A 2008 brochure stated: "James Hardie

siding is tough.  Remarkably so.  And to prove it, most of our products come

with a 50-year transferable warranty.  Rain.  Hail.  Impact.  Wind.  Fire.

Fluctuations in humidity.  Even hurricanes.  None of its stands a chance against

James Hardie."  (Moriarity Decl., Ex. 39, 2008 Hardie "A Siding for All Seasons" at 549.)

Plaintiffs point to a 1993 article from the Journal of Consumer Research, in which the authors note the theory that manufacturers might use the warranty as a "signal" of the durability of their goods, and attempt to test whether consumers do view the length of a warranty as a signal of durability.  (Moriarity Decl., Ex. 43, William Boulding and Amna Kirmani, A Consumer-Side Experimental Examination of Signaling Theory: Do Consumers Perceive Warranties as Signals of Quality?, 20 J. Consumer Research 111 (1993).)  The study's authors opined that their laboratory experiment showed that, if a firm has high credibility, consumers are more likely to see a long warranty as a signal of quality, but that this is not true for a low credibility firm.  (Id. at 119.)  They further explained that their research was limited to one laboratory experiment with one fictional company that made personal computers, so generalizations could not be made. (Id. 119-22.)

### B.    Procedural History

In March 2011, Plaintiff Heidi Picht sued Hardie in Minnesota state court and the matter was removed to this Court.  Hardie moved for summary judgment and to dismiss.  (Civil File No. 11-958 [Docket No. 25])  The motion

8

was stayed until the remainder of the MDL cases were also at the summary

judgment stage.

After their individual cases were consolidated in this Court as a

Multidistrict Litigation, eleven Plaintiffs from eight states filed a Consolidated

Complaint. [MDL Docket No. 33] On July 15, 2013, this Court denied in part

and granted in part Defendant's motion to dismiss the Consolidated Complaint.

[MDL Docket No. 60] On August 9, 2013, Plaintiffs filed the First Amended

Consolidated Complaint ("ACC"), which names the following as named

Plaintiffs: Heidi Picht (Minnesota), Jonathan Bowers (Minnesota), Hugh Fenwick

(Nevada), Michael Swiencki (Georgia), the Susan S. Buchanan Personal

Residence Trust through its trustee Susan Buchanan (Florida), James Dillingham

(California), John Brown (Illinois), Mark Kostos (Illinois), Richard Treece

(Illinois), Masoud Kavianpour (Virginia), and Brian Bethel (Ohio). [MDL Docket

No. 63]

On June 30, 2014, the Court granted in part and denied in part Defendant's

motion to dismiss the Complaint in a tag-along action filed by Wisconsin

Plaintiff Steven Schindler. [MDL Docket No. 116] Schindler has since left the

litigation and has been replaced with Wisconsin Plaintiffs David and Sharon Angelici (Civil File No. 14-285 [Docket Nos. 33-1, 36].)

On April 27, 2015, the Court granted in part and denied in part Defendant's motion to dismiss the Complaint in a tag-along action (Civil File No. 14-4655) filed by Colorado Plaintiff John Hernandez. [MDL Docket No. 135]

Based on the ACC, the Angelicis' Complaint, and Hernandez's Complaint, remaining before the Court are 1) breach of express warranties by all Plaintiffs except Illinois Plaintiffs Treece and Kostos, 2) breach of implied warranties by Minnesota Plaintiff Picht and Colorado Plaintiff Hernandez; 3) a negligence claim by Picht; 4) declaratory and injunctive relief claims for all Plaintiffs; 5) statutory consumer protection claims by all Plaintiffs; 5) an unjust enrichment claim by Wisconsin Plaintiffs the Angelicis; and 6) a failure of essential purpose claim by Hernandez.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## IV.    (SWIENCKI: GEORGIA) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 306]

### A.    Facts Related to Plaintiff Michael Swiencki

On September 24, 2008, Plaintiff Michael Swiencki purchased his house in

a new housing development in Douglasville, Georgia.  ([Docket No. 383] Second

Polakoff Decl., Ex. 1, Swiencki Dep. 16.)  At the time of Swiencki's purchase, the

house already had Hardieplank siding, which had been installed during the

original construction earlier in 2008.  (Id. 16-20.)  He purchased the house from

Homestead Bank, which had foreclosed on the housing development after the

developer went out of business.  (Id. 16, 18.)

Swiencki did not know that Hardieplank was on the house when he

purchased the house; he did not know what manufacturer's siding was on the

house.  ([Docket No. 310] Frakes Decl., Ex. A, Swiencki Dep. 25.)  Swiencki has

"no idea" from where the siding was purchased or what entity purchased the

siding.  (Id. 20.)  He had never seen or heard anything about Hardie siding from

any source before he purchased his house in 2008.  (Id. 26, 28-29.)

Before Swiencki purchased the house, he received a brochure created by

RE/MAX, the real estate agent, which stated that the housing development

houses had "[c]oncrete siding with life time warranty."  (Frakes Decl., Ex. B.)

The brochure also stated: "All information herein believed to be accurate but not

warranted."  (Id.)  Swiencki admitted that the brochure did not mention Hardie

or Hardieplank.  (Swiencki Dep. 25-26.)

In April 2011, Swiencki noted that the Hardieplank siding was gapping,

bending, shrinking, and warping.  (Second Polakoff Decl., Ex. 2, Swiencki's

Answers to Defendants' First Set of Interrogatories at 7; Second Polakoff Decl.,

Ex. 3, Swiencki's Amended Answers to Defendants' First Set of Interrogatories,

at 4.)  He further asserts that the siding has, at some point, exhibited flaking,

cracking, and delamination.  (Second Polakoff Decl., Ex. 2, Swiencki's Answers to

Defendants' First Set of Interrogatories at 11; Second Polakoff Decl., Ex. 3,

Swiencki's Amended Answers to Defendants' First Set of Interrogatories, at 4.)

The conditions worsened over time, and Swiencki has noticed that the other

homes in his subdivision with Hardieplank have suffered the same deterioration. (Second Polakoff Decl., Ex. 1, Swiencki Dep. 53, 62-64.)

On November 3, 2011, Swiencki submitted a warranty claim to Hardie asserting that he had noticed warping and gapping. (Second Polakoff Decl., Ex. 4, Warranty Claim.) On November 8, Hardie emailed Swiencki and denied his claim, stating that it "found nothing to indicate that the siding is defective or resultant of any observed manufacture related failure." (Second Polakoff Decl., Ex. 5.) "[A]s a good will gesture," Hardie offered Swiencki "replacement product that [he] may wish to use when making repairs." (Id.) During a telephone call with Hardie on November 7, a Hardie representative told Swiencki that the photographs he sent showed that the issues were a result of something behind the siding and were related to how it was installed. (Second Polakoff Decl., Ex. 1, Swiencki Dep. 76.) Hardie did not inspect his home before deciding the claim. (Id.)

Swiencki did not accept the offer of replacement product because he thought that the replacement product would perform the same as the original siding. (Swiencki Dep. 71-72.) He received an estimate from a roofing and

construction company that it would cost $9,000 to remove and replace his Hardieplank siding.  (Second Polakoff Decl., Ex. 6.)

On February 17, 2012, Swiencki filed suit against Hardie in the Central District of California.  (Civil File No. 12-1392 [Docket No. 1].)

### B.    Choice of Law

"When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located.  When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation."  In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir. 1996) (citations omitted).  Thus, the "transferee court must apply the 'choice-of-law rules of the states where the actions were originally filed.'"  Id. (quoting In re Air Crash Disaster Near Chicago, Ill., 644 F.2d 594, 610 (7th Cir. 1981)).

Swiencki brought his lawsuit in federal court in California.  California applies the "governmental interest analysis."  McCann v. Foster Wheeler LLC, 225 P.3d 516, 527 (Cal. 2010).  Because the "situs of the injury" is a relevant factor, id. at 530, and Defendant's siding was installed on and allegedly deteriorated on Swiencki's home in Georgia; Swiencki is and was a Georgia resident (Frakes

14

Decl., Ex. A, Swiencki Dep. 112); and the injury occurred in Georgia, this Court applies Georgia law.

### C.    Summary of the Motion

Swiencki asserts four claims against Hardie, and Hardie now moves for summary judgment on all four: Count 1: Breach of Express Warranty; Count 4: Declaratory and Injunctive Relief; Count 5: Violations of the California Unfair Competition Law ("UCL"); and Count 6: Violations of the California Consumers Legal Remedies Act ("CLRA").

### D.    Count 1: Breach of Express Warranty

#### 1.    Standard for Breach of Express Warranty under Georgia Law

An express warranty may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  Ga. Code § 11–2–313.  Swiencki alleges that Hardie breached two alleged express warranties: statements made in marketing materials (the "informal" warranty) and Hardie's "formal" Limited Warranty.

#### 2.    Informal Express Warranty

Swiencki's express warranty claim based on "informal" warranties fails for lack of privity and because no informal express warranty was made to Swiencki. "[U]nder Georgia law, warranty claims may only be brought by those in privity

with the Defendant or those 'in the family or household of [the] buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty.'"  Goodson v. Boston Sci. Corp., No. 1:11-CV-3023-TWT, 2011 WL 6840593, at *5 (N.D. Ga. Dec. 29, 2011) (quoting Ga. Code § 11–2–318) (citing Bryant v. Hoffmann–La Roche, Inc., 585 S.E.2d 723 (Ga. Ct. App. 2003)). Swiencki purchased the house, not the siding, and he purchased the house from Homestead Bank.  Thus, he was not in privity with Hardie.  Moreover, Swiencki testified that he was never exposed to any of Hardie's marketing materials before he bought his house, and, when he bought the house, he did not know that the siding on the house was manufactured by Hardie.  Under Georgia law, an affirmation of fact or promise "made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" creates an express warranty.  Ga. Code § 11-2-313(1)(a).  If the buyer was not ever exposed to the alleged affirmation, the affirmation cannot be part of the basis of the bargain.

### 3.    Formal Express Warranty

Swiencki also asserts that Hardie breached the formal Limited Warranty that it provided with all Hardieplank.

16

Hardie asserts that the Limited Warranty does not apply to Swiencki's claim because the Limited Warranty covers only manufacturing defects; it does not cover design defects. In this MDL, all Plaintiffs assert a design defect in Hardie's siding, not a manufacturing defect.

The Limited Warranty warrants that the siding "is free from defects in material and manufacture." The case law overwhelming holds that design defects are not covered by warranties for materials and workmanship. "[W]here a product is manufactured correctly but designed inappropriately, the defect is one of design and not 'material or workmanship.'" Bruce Martin Const., Inc. v. CTB, Inc., 735 F.3d 750, 753 (8th Cir. 2013). Thus, a defendant whose express warranty warrants a product against "all defects in material and workmanship," is entitled to summary judgment when a plaintiff's express warranty claim is based on design defects. Id. 753-54. See also, e.g., Coba v. Ford Motor Co., No. 12-1622 (KM) (MAH), 2016 WL 5746361, at *9-10 (D.N.J. Sept. 30, 2016) (adopting the view of the "vast weight of authority" "that a workmanship and materials warranty cannot encompass a design defect claim") (citation omitted); Troup v. Toyota Motor Corp., 545 F. App'x 668, 668-69 (9th Cir. 2013) (holding that, under California law, "express warranties covering defects in materials and

workmanship exclude defects in design"); <u>Voelker v. Porsche Cars N. Am., Inc.</u>,

353 F.3d 516, 520, 527 (7th Cir. 2003) (holding that, under Illinois law, warranty

for product that is "defective in material or workmanship" does not cover design

defect).

Georgia law is in accord insofar as Georgia distinguishes design and

manufacturing defects: "a manufacturing defect results from an error specifically

in the fabrication process, as distinct from an error in the design process."

<u>Fletcher v. Watter Applications Distrib. Group, Inc.</u>, 773 S.E.2d 859, 863 (Ga. Ct.

App. 2015), <u>aff'd in relevant part, rev'd in part</u>, 2016 WL 6996282 (Ga. Nov. 30,

2016). "When a plaintiff calls into question the safety of an entire product line, . .

. the claim is one for a design defect and not for a manufacturing defect." <u>Id.</u> at

864. <u>See also</u> <u>Garcia v. Chrysler Group LLC</u>, 127 F. Supp. 3d 212, 224, 226, 227

(S.D.N.Y. 2015) (dismissing Georgia express warranty claims based on design

defect because the limited warranty, which covered "material, workmanship or

factory preparation," did not cover design defects).

Hardie's use of the words "materials and manufacture" in its Limited

Warranty, rather than the words "materials and workmanship" does not bring

design defects within the reach of the warranty. The use of the word

18

"manufacture" makes it clearer that the warranty covers only manufacturing defects.

The Court notes that Hardie's Limited Warranty also states:

When used for its intended purpose, properly installed and maintained according to Hardie's published installation instructions, the Product for a period of 50 years from the date of purchase . . . (c) will not crack, rot or delaminate.

(Limited Warranty § 1.) However, any potential ambiguity as to whether cracking, rotting, or delamination caused by a design defect is covered by the Limited Warranty is explicitly addressed in the exclusions. The Limited Warranty Exclusions section, Section 3, excludes from coverage damages or defects resulting from "any cause other than manufacturing defects attributable to Hardie." Thus, the Limited Warranty clearly disclaims coverage for cracking, rotting, or delamination if it is caused by something other than a manufacturing defect, such as by a design defect.

Swiencki points out that Hardie's warranty provides that it

warrants (for installation in the U.S. and Puerto Rico) . . . that when manufactured, the Hardie Fiber-Cement Plank or Panel Product HARDIPLANK or HARDIPANEL, (the "Product") complies with ASTM C1186, and is free from defects in material and manufacture.

(Limited Warranty § 1.)

19

ASTM C1186 is the industry standard that supplies the requirements for the strength and composition of fiber-cement siding. Swiencki reasons that these compositional requirements necessarily implicate the design of the siding. Thus, Hardie cannot suggest that "material and manufacture" excludes design defects.

The fact that the warranty stated that the siding complied with an industry performance standard, ASTM C1186, has no bearing on Plaintiffs' claims. Plaintiffs do not claim that the siding fails to comply with ASTM C1186. Plaintiffs' own expert admitted that he had "no reason to dispute that [the siding] complies with C1186." ([Docket No. 390] Second Frakes Dillingham Decl., Ex. G, Wolf Dep. 318-19.) The statement that the siding will be "free from defects in material and manufacture" simply means that Hardie also warrants against defects in materials and manufacturing defects. There is no inconsistency.

In sum, the Limited Warranty does not cover design defects, and Swiencki only alleges a design defect. Therefore, Hardie is entitled to summary judgment on the breach of the formal express warranty claim.

### E.    Count 5: California Unfair Competition Law and Count 6: California Consumers Legal Remedies Act

The California UCL and California CLRA do not apply to Swiencki

because he is a Georgia resident who was injured in Georgia and had no

exposure to Hardie's marketing or representations before he purchased his

house, so he cannot show that the challenged conduct emanates from California.

> In determining whether the UCL and CLRA apply to non-California residents, courts consider where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which advertising and other promotional literature decisions were made.

In re Toyota Motor Corp., 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011) (citations

omitted).

The California Supreme Court has held that the UCL does not operate

"with respect to occurrences outside the state."  Sullivan v. Oracle Corp., 254

P.3d 237, 248 (Cal. 2011) ("However far the Legislature's power may theoretically

extend, we presume the Legislature did not intend a statute to be operative, with

respect to occurrences outside the state, . . . unless such intention is clearly

expressed or reasonably to be inferred from the language of the act or from its

purpose, subject matter or history.  Neither the language of the UCL nor its

legislative history provides any basis for concluding the Legislature intended the

UCL to operate extraterritorially.  Accordingly, the presumption against

extraterritoriality applies to the UCL in full force.") (citations omitted).  "[T]he UCL does not apply to actions occurring outside of California that injure non-residents."  Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc., No. 09–5815 CW, 2010 WL 3619884, at *8 (N.D. Cal. Sept. 10, 2010), aff'd, 487 F. App'x 362 (9th Cir. 2012) (citation omitted).

Similarly, the CLRA does not apply extraterritorially.  See McKinnon v. Dollar Thrifty Auto. Group, Inc., No. 12-4457 SC, 2013 WL 791457, at *4 (N.D. Cal. Mar. 4, 2013) ("With regard to the UCL and CLRA, non-California residents' claims are not supported where none of the alleged misconduct or injuries occurred in California.") (citation omitted).

Here, Swiencki did not see any advertising from Hardie, let alone any advertising emanating from California.  Thus, as a Georgia resident who was injured in Georgia and who did not see any allegedly deceptive or misleading advertising emanating from California, Swiencki cannot assert a claim under the UCL or CLRA.  See In re Toyota Motor Corp., 785 F. Supp. 2d at 917–18 (dismissing non-California residents' UCL and CLRA claims when they failed to allege that they saw advertising or promotional literature disseminated from California).  Cf. Darisse v. Nest Labs, Inc., No. 5:14-CV-01363-BLF, 2016 WL

4385849, at *15 (N.D. Cal. Aug. 15, 2016) (holding that, in nationwide class action in which plaintiffs sought application of UCL and CLRA nationwide, each individual state's law applied because "California considers the geographic location of the omission or where the misrepresentations were communicated to the consumer as the place of the wrong" and "[f]or the out-of-state [] buyers, the place of the wrong is not California, but the state where each [] buyer saw [defendant's] advertising, relied on it, and bought the [product]").  Finally, Swiencki cannot state an unfair handling claim when he testified that he had no complaints about how Hardie handled his warranty claim and, when asked to identify improperly handled warranty claims in an interrogatory, did not name his own claim. ([Docket No. 388] Second Frakes Swiencki Decl., Ex. H, Swiencki Dep. 82; Second Frakes Swiencki Decl., Ex. N, Swiencki Answer to Interrogatory No. 16.).)  Thus, the Court grants summary judgment on Counts 5 and 6.

### F.    Count 4: Declaratory and Injunctive Relief

Because "declaratory and injunctive relief are remedies rather than claims," Podpeskar v. Makita U.S.A. Inc., 247 F. Supp. 3d 1001, 1013 (D. Minn. 2017), and because all of Swiencki's substantive claims are dismissed, Hardie is entitled to summary judgment on Count 4.

23

## V.    (KAVIANPOUR: VIRGINIA) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 311]

### A.    Facts Related to Plaintiff Masoud Kavianpour

In March 2005, Plaintiff and Virginia resident Masoud Kavianpour bought a townhouse in Leesburg, Virginia, from home developer Arcadia-Potomac Crossing, L.C., ("Arcadia") as an investment property.  ([Docket No. 315] Frakes Kavianpour Decl., Ex. A, Kavianpour Dep. 24-26, 35; Frakes Decl., Ex. B, Kavianpour Answer to Interrogatory No. 2.)  Kavianpour owns approximately 15 rental properties and manages an additional 25 properties.  (Kavianpour Dep. 26.)  The house at issue was built by Arcadia.  (Kavianpour Answer to Interrogatory No. 2.)  Arcadia purchased Hardieplank siding for the house.  (Id.)  Arcadia had the Hardieplank installed in February or March 2005 by Best Siding Corp.  (Id.; Kavianpour Dep. 37-38.)  Kavianpour did not choose the Hardieplank; rather, Arcadia required that it would install Hardieplank on all of the houses in this development and Kavianpour could not choose a different siding product.  (Kavianpour Dep. 39.)  Kavianpour does not know from whom Arcadia purchased the siding or how much it paid for the siding.  (Id. 44, 56.)  He understood that Arcadia was not employed by Hardie.  (Id. 53.)

24

Before the purchase, Arcadia sales manager Holly Horne Poole told Kavianpour that Hardieplank was "top-of-the-line," required little maintenance, did not require painting, and was covered by a lifetime warranty. ([Docket No. 381] Wanta Decl., Ex. 1, Kavianpour Dep. 40, 46, 65.) He understood a warranty to mean that, if Hardieplank failed, Hardie "would take any corrective action to either replace those product or whatever is required to fix them." (Id. 114.)

Horne Poole obtained information about Hardieplank from a sample board she received from Arcadia. She showed the board to all interested homebuyers. (Wanta Decl., Ex. 2, Horne Poole Decl. ¶¶ 5-8.) Horne Poole claims that she showed Kavianpour the Hardie sample board and that he relied on that information. (Horne Poole Decl. ¶ 9.) Kavianpour has now submitted a declaration in which he states that, when deciding whether to buy the townhome, he relied on Horne Poole's statements that Hardieplank was "a top-of-the-line product," "the best product available at the time," "would require little maintenance and no painting," and "came with a 50-year warranty." (Wanta Decl., Ex. 3, Kavianpour Decl. ¶¶ 6-7, 10; Horne Poole Decl. ¶ 8.)

Kavianpour never interacted with anyone from Hardie before he bought the house. (Frakes Kavianpour Decl., Ex. A, Kavianpour Dep. 32.) He has never

received or reviewed any Hardie marketing material and never received any information from Hardie before he bought the house.  (Id. 49-50, 54; Frakes Decl., Ex. B, Answer to Interrogatory Nos. 1, 10.)  He only interacted with Arcadia. (Kavianpour Dep. 32.)

Based on statements by Arcadia, Kavianpour believed that Hardieplank had a lifetime warranty.  (Frakes Kavianpour Decl., Ex. A, Kavianpour Dep. 45-46, 61; Frakes Decl., Ex. B, Kavianpour Answer to Interrogatory No. 1.)  Hardie avers that it has never offered a lifetime warranty on any of its siding products. ([Docket No. 314] Klein Decl. ¶ 5.)

In June or July 2006, Kavianpour noticed a "spotting" problem on the house: there were about 6 spots on the front and 6 spots on the back for a "[t]otal of about 12 pieces between the front and the back of the house."  (Kavianpour Dep. 66-68, 70.)  He believed that there was a problem with the siding, but he "did not do anything at that time" about the problem because he "just wanted to be sure that this is an ongoing issue or this is just an initial issue."  (Id. 68, 70.)

In 2009, Kavianpour contacted Arcadia with concerns about his siding, and Arcadia referred him to the company that installed the Hardieplank, Best Siding, and told him to ask if Best Siding had "used some kind of wrong touch-up on the

areas where they install the siding."  (Wanta Decl., Ex. 1, Kavianpour Dep. 68, 75, 82.)  Kavianpour asked Best Siding if it had "used any kind of touch-up [paint] for installation of this siding[]," and Best Siding stated that it had not.  (Id. 82-83.)

On April 15, 2010, Kavianpour submitted a warranty claim to Hardie, stating that his only concern was spotting on the siding.  (Frakes Kavianpour Decl., Ex. A, Kavianpour Dep. 89; Wanta Decl., Ex. 4.)  He "had several conversations with [Hardie] that [Hardie] wanted to send one of their own painter, someone over there to examine and test before they send me the rejection."  (Wanta Decl., Ex. 1, Kavianpour Dep. 90.)  He does not know if someone from Hardie did inspect his house or not.  (Id. 91.)

On June 8, 2010, Hardie denied Kavianpour's claim, finding that the problems were "'installation' related" and that there had been improper application of touch-up paint.  (Wanta Decl., Ex. 1, Kavianpour Dep. 88, 90-91; Wanta Decl., Ex. 5.)

Based on Hardie's records, it had Carl Collis from Leesburg Paint conduct a site visit on June 16, 2010.  ([Docket No. 394] Second Frakes Kavianpour Decl., Ex. F.)  After the site visit, Collins left a voicemail for Hardie stating "that this is not a fading issue.  This issue is due to improper touchup."  (Id.)  Based on this

information, Hardie told Kavianpour that the "spotting" issue was not due to the Hardie finish, but due to the builder's application of touch-up paint, and told him that he would be getting a letter about this.  (Id.)

On August 28, 2012, Kavianpour filed this lawsuit against Hardie in the Eastern District of Virginia.  (Civil File No. 12-2268.)

## B.   Choice of Law

Virginia applies the place of the wrong standard for choice of law.  Jones v. R.S. Jones & Assocs., Inc., 431 S.E.2d 33, 34 (Va. 1993).  Because Kavianpour is a Virginia resident, the siding was installed in Virginia, and the alleged defects manifested in Virginia, the Court applies Virginia law.

## C.   Summary of the Motion

Kavianpour asserts five claims against Hardie: Count 1: Breach of Express Warranty; Count 4: Declaratory and Injunctive Relief; Count 5: Violations of the California UCL; Count 10: Violation of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-200(A)(5); and Count 11: Violation of the VCPA, Va. Code § 59.1-200(A)(6).  Hardie moves for summary judgment on all five claims.

## D.   Count 1: Breach of Express Warranty

### 1.   Standard for Breach of Express Warranty under Virginia Law

Under Virginia law:

28

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

Va. Code § 8.2-313(1)(a).

### 2.    Informal Express Warranty

#### a)    Whether an Informal Express Warranty Was Made to Kavianpour

The Court grants summary judgment on the breach of the informal express warranty claim because Hardie made no informal express warranty to Kavianpour.  Under the Virginia UCC, an express warranty is created by an affirmation of fact or promise "made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  Va. Code Ann. § 8.2-313(1)(a).  If the buyer was never exposed to the alleged affirmation, the affirmation cannot be part of the basis of the bargain.

Kavianpour testified that, before he bought the townhouse, he never received or reviewed any Hardie marketing materials.  In fact, Kavianpour did not even have an option of deciding what type of siding would be on the house.  According to Kavianpour's testimony and interrogatory answers, his builder told him that the siding had a lifetime warranty, not a 50-year warranty.  Further, he

testified that he did not remember anyone telling him, before he bought the house, that the siding had a 50-year warranty.  (Frakes Decl., Ex. A, Kavianpour Dep. 45-46, 61.)  He cannot now create a genuine issue of material fact by contradicting his previous sworn testimony in a new affidavit.  See, e.g., Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[Lower courts] have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

Because there is no evidence of an agency relationship, statements by Arcadia cannot be imputed to Hardie as express warranties.  See Talley v. Danek Med., Inc., 7 F. Supp. 2d 725, 733 (E.D. Va. 1998), aff'd, 179 F.3d 154 (4th Cir. 1999) (granting summary judgment on express warranty claim against manufacturer based on statement by surgeon when there is no evidence of an agency relationship and no "showing that [the manufacturer] itself provided that information").  Furthermore, Kavianpour did not identify Arcadia or Horne

30

Poole as Hardie's agents in response to interrogatories and testified that he

understood that Arcadia was not employed by Hardie.

Even if there were evidence that Hardie had told Kavianpour that

Hardieplank came with a 50-year warranty, Hardie would not have breached

that warranty because the siding did come with a 50-year warranty.  There is no

allegation that Hardie breached a promise that the siding came with that

warranty.  See Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2014

WL 2987657, at *3 (D. Minn. June 30, 2014) ("Schindler does not allege that

Defendant's products did not come with a 50–year transferrable warranty, so

there is no allegation that Defendant breached that promise.").

Moreover, to the extent that Kavianpour implies that a 50-year warranty

constitutes a representation regarding the useful life of the siding, the Court

rejects that theory.  As this Court has previously held, "[a]n advertisement's

reference to a formal limited warranty does not, on its own, create a new

informal promise that the product will last for a certain amount of time without

any of the terms or conditions of the limited warranty."  Hardieplank Fiber

Cement Siding Litig., 2014 WL 2987657, at *3.  See also Gonzalez v. Corning, 317

F.R.D. 443, 516 (W.D. Pa. 2016) (noting that plaintiffs could provide "no citation

to any legal authority to support their foundational contention that a limited

warranty of a set number of years is a representation about the useful life of a

product" and concluding that "Plaintiffs' theory is not only novel and

unsupported, but also is contrary to law").  As a practical matter, accepting

signal theory would eviscerate warranties by requiring that if a manufacturer

provided any type of limited warranty, it would become a guarantor for its

product for that length of time, regardless of the terms and limitations of the

written warranty.  Moreover, the law review article cited by Plaintiffs actually

rejects signal theory.  See George L. Priest, A Theory of the Consumer Product

Warranty, 90 Yale L.J. 1297, 1327, 1347 (1981).

### b)      Statute of Limitations

The Court further notes that, even if there were evidence of actionable

representations by Hardie to Kavianpour, Kavianpour's breach of the informal

express warranty claim is barred by the statute of limitations.  Virginia law

imposes a four-year statute of limitations for breach of express warranty claims.

Va. Code § 8.2-725(1).  A cause of action accrues "when the breach occurs,

regardless of the aggrieved party's lack of knowledge of the breach."  Id.(2).  A

breach of warranty "occurs when tender of delivery is made,"

except that where a warranty explicitly extends to future
performance of the goods and discovery of the breach must await
the time of such performance the cause of action accrues when the
breach is or should have been discovered.

Id.

In this case, any purported breach of an informal express warranty accrued

in 2005, upon delivery and installation of the siding, unless the warranty fits

within the future performance exception.  With regard to the future performance

exception, "courts have vigorously enforced the U.C.C.'s statutory explicitness

requirement."  Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 879

(8th Cir. 2000) (discussing Minnesota UCC).  In Kavianpour's interrogatory

answers, he names three express warranties as the basis for Count 1: 1) Hardie's

representation that the siding was covered by a 50-year warranty; 2) Arcadia's

statement that Hardieplank had a 50-year warranty; and 3) Arcadia's statement

that Hardieplank "would require little maintenance and not require painting."

(Frakes Kavianpour Decl., Ex. C, Kavianpour Answer to Interrogatory No. 11.)

Hardie's representation that the siding came with a 50-year transferrable

warranty does not constitute a warranty of future performance.  See In re

Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2014 WL 2987657, at *3

(D. Minn. June 30, 2014) (noting that "[a]n advertisement's reference to a formal

limited warranty does not, on its own, create a new informal promise that the product will last for a certain amount of time without any of the terms or conditions of the limited warranty" and holding that the future performance exception did not apply).

Next, in Kavianpour's interrogatory answers, he identified an oral statement by his builder, not Hardie, that the siding would require "little maintenance" as a purported breach of warranty. There is no evidence that Hardie made such a statement to Kavianpour. Rather, the evidence shows that Hardie made no statements to Kavianpour. Furthermore, "little maintenance" is not an explicit warranty of future performance. "The overwhelming weight of authority requires a buyer . . . to prove that its seller specifically warranted the product for a defined period of time in the future." Econ. Hous. Co. v. Cont'l Forest Prod., Inc., 805 F.2d 319, 321 (8th Cir. 1986) (citing cases from across the country) (applying Nebraska law). Virginia law is the same. See Royal Indem. Co. v. Tyco Fire Prod., LP, 704 S.E.2d 91, 98 (Va. 2011) (holding no future performance exception when "[n]owhere in the description of how the sprinkler heads work does [the manufacturer] promise that the sprinkler heads will operate correctly for a particular period of time").

Therefore, the informal express warranty claim accrued upon delivery of

the siding in 2005, so Kavianpour's filing in 2012 was untimely.  Finally, there

can be no estoppel claim because Kavianpour's first contact with Hardie was in

April 2010, when he submitted a warranty claim.  At that time, the statute of

limitations had already expired.

### 3.    Formal Express Warranty

The Court grants summary judgment on the breach of the formal express

warranty claim based on statute of limitations.

Virginia law provides:

In every action for which a limitation period is prescribed, the right
of action shall be deemed to accrue and the prescribed limitation
period shall begin to run from the date the injury is sustained in the
case of injury to the person or damage to property, when the breach
of contract occurs in actions ex contractu and not when the resulting
damage is discovered, except where the relief sought is solely
equitable or where otherwise provided under § 8.01-233, subsection
C of § 8.01-245, §§ 8.01-249, 8.01-250 or other statute.

Va. Code § 8.01-230.

[The Virginia Supreme Court] court, from early times, has adhered
to the general rule . . . that the limitation begins to run from the
moment the cause of action accrues and not from the time it is
ascertained that damage has been sustained.  . . .  The difficulty in
ascertaining the fact that a cause of action exists plays no part in the
general rule.

Richmond Redevelopment & Hous. Auth. v. Laburnum Const. Corp., 80 S.E.2d 574, 580–81 (Va. 1954), superseded by statute on other grounds. "It is well settled that if an injury occurs, even though it be ever so slight and not capable of ascertainment at the time, the cause of action then accrues." Owens v. Combustion Eng'g, Inc., 279 F. Supp. 257, 258 (E.D. Va. 1967) (footnote omitted).

When Kavianpour submitted his warranty claim to Hardie in 2010, he only sought coverage for the spots he observed on the siding. Kavianpour admitted that he noticed spots appearing on the Hardieplank in approximately June or July 2006. Furthermore, he testified that, in June or July 2006, he knew that there was a problem with the siding. Virginia law is clear that the express warranty claim accrues when the first injury occurs, no matter how slight and whether or not the damages continue to worsen. Thus, the statute of limitations expired four years later in 2010, but he did not file suit until 2012. Furthermore, the Court notes that for the reasons explained with respect to Plaintiff Swiencki, the Limited Warranty does not provide coverage for design defect.

### E.     Count 5: Violations of the California UCL

The Court grants Hardie's motion for summary judgment on the UCL claim because the UCL has no applicability here. Kavianpour is a Virginia resident, injured in Virginia by a product installed in Virginia. He received no

representations from Hardie at all, let alone any emanating from California.

Thus, there is no basis to apply California law to his claims. Moreover, to the

extent Kavianpour bases Count 5 on a claim that his warranty claim was

mishandled, Kavianpour did not identify his own claim as a claim that had been

mishandled in response to interrogatories. (Frakes Kavianpour Decl., Exs. B-C,

Kavianpour Answer to Interrogatory No. 16.) And because Kavianpour is

asserting a design defect, which is not covered by Hardie's Limited Warranty,

the fact that Hardie denied his warranty claim is insufficient to sustain a UCL

claim.

### F.    Counts 10 and 11: Violations of the VCPA

Kavianpour's VCPA claims fail because Hardie's sale of siding was not a

consumer transaction, as Plaintiffs concede. The VCPA only applies to

"fraudulent acts or practices" committed "in connection with a consumer

transaction." Va. Code § 59.1-200(A). "Virginia courts have interpreted this

definition to exclude transactions in which goods are first sold to an

intermediary—e.g., a contractor or subcontractor—and used as components in

larger construction projects. These transactions have been called 'commercial

transactions,' as opposed to 'consumer transactions.'" In re Atlas Roofing Corp.

Chalet Shingle Prod. Liab. Litig., No. 1:13-MD-2495-TWT, 2015 WL 3824020, at *3

(N.D. Ga. June 19, 2015) (footnotes omitted).  Here, Kavianpour did not purchase

siding from Hardie; Arcadia purchased the Hardieplank to be installed as a

component of the entire house, which was a commercial transaction.  The VCPA

does not apply.  Moreover, Kavianpour did not buy the house "primarily for

personal, family or household purposes."  Va. Code. § 59.1-198 (defining

"consumer transaction").  Rather, he bought it as an investment and lives in a

different house.  Thus, the sale of Hardieplank was not a consumer transaction

and the VCPA does not apply.

### G.    Count 4: Declaratory and Injunctive Relief

Because the Court grants summary judgment on all of Kavianpour's

substantive claims, Hardie is entitled to summary judgment on his request for

declaratory and injunctive relief in Count 4.

## VI.    (SUSAN S. BUCHANAN PERSONAL RESIDENCE TRUST: FLORIDA) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 316]

### A.    Facts Related to Plaintiff The Susan S. Buchanan Personal Residence Trust

In 2005, Roger and Susan Buchanan built a new home located in Winter

Haven, Florida.  ([Docket No. 373] Second Peterson Buchanan Trust Decl., Ex. 2,

S. Buchanan Dep. 18-19; [Docket No. 319] Frakes Buchanan Trust Decl., Ex. B, R. Buchanan Dep. 13.)

Berry Development Corporation ("Berry") built the house and installed the siding. (Frakes Buchanan Trust Decl., Ex. C, Buchanan Trust Answer to Interrogatory No. 2; R. Buchanan Dep. 13.) On March 16, 2005, and May 17, 2005, Berry purchased Hardieplank siding for the house from Universal Forest Products. (Buchanan Trust Answer to Interrogatory No. 2; R. Buchanan Dep. 13-14.) Berry installed the siding between March and June 2005. (Buchanan Trust Answer to Interrogatory No. 2; R. Buchanan Dep. 16-18.)

Before the Buchanans selected the siding, they told their builder, Robert Berry, that they wanted siding to be durable and "look like an authentic old plantation house," and he responded "I've installed [Hardieplank] before, and it's a good choice." (Frakes Buchanan Trust Decl., Ex. B, R. Buchanan Dep. 21.) Berry also said that Hardieplank would require "little to no maintenance." (Frakes Buchanan Trust Decl., Ex. B, R. Buchanan Dep. 24.) Roger Buchanan understood Berry to be "referring to the frequency with which it would need to be repainted." (Id. 25.) Because the siding has not needed to be repainted since

it was installed, Roger Buchanan testified that the siding has required little to no maintenance as he understood the builder's statement.  (Id.)

The Buchanans also spoke to their architect, Stephen Smith, and told him that they wanted the house to "look like an authentic plantation house, but [they] wanted to minimize maintenance, so it should use synthetic materials when that wouldn't detract from the appearance."  (R. Buchanan Dep. 29-30.)  Smith responded that "fiber cement was the best choice" and recommended Hardieplank because he had previous positive experience with it and found it to be durable.  (Id. 30-31; Frakes Buchanan Trust Decl., Ex. A, S. Buchanan Dep. 21-22.)  Smith also told them that Hardieplank had a 50-year warranty.  (Second Peterson Decl., Ex. 2, S. Buchanan Dep. 42-43.)

The Buchanans did not rely on anything other than the oral conversations with their architect and builder when selecting the siding.  (Frakes Buchanan Trust Decl., Ex. A, S. Buchanan Dep. 27-28; Frakes Buchanan Trust Decl., Ex. B, R. Buchanan Dep. 32-33.)

Before the siding was installed, the Buchanans never spoke with anyone from Hardie, visited the Hardie website, viewed a Hardieplank television commercial, heard a Hardieplank radio commercial, or saw any brochure or

written advertisement about Hardieplank.  (Frakes Buchanan Trust Decl., Ex. A, S. Buchanan Dep. 26-28; Frakes Buchanan Trust Decl., Ex. B, R. Buchanan Dep. 28-29; Frakes Buchanan Trust Decl., Ex. C, Buchanan Trust Answer to Interrogatory No. 1.)

In February 2009, the title of the Buchanans' home was transferred from Susan and Roger Buchanan to the Susan S. Buchanan Personal Residence Trust ("Buchanan Trust").  (Frakes Buchanan Trust Decl., Ex. A, S. Buchanan Dep. 13-15.)

In November 2010, the Buchanans noticed that three or four Hardieplank boards were warping.  (Frakes Buchanan Trust Decl., Ex. C, Buchanan Trust Answer to Interrogatory No. 5; S. Buchanan Dep. 30-32; R. Buchanan Dep. 25-26, 37-42.)  Roger Buchanan contacted Berry, because he thought that something was wrong with the siding, and Berry attempted to fix the problem by nailing the boards back flush.  (R. Buchanan Dep. 25-26, 38-39.)  Berry nailed three or four boards and did not say anything about the siding at that time.  (Second Peterson Decl., Ex. 1, R. Buchanan Dep. 27.)

In 2012, dozens of boards in the siding were warped.  (Frakes Buchanan Trust Decl., Ex. B, R. Buchanan Dep. 39-40.)  On February 8, 2012, the Buchanans

submitted a warranty claim to Hardie.  (Frakes Buchanan Trust Decl., Ex. A, S.

Buchanan Dep. 37; Second Peterson Decl., Ex. 1, R. Buchanan Dep. 52-53.)  Seven

days later, on February 15, 2012, the Buchanan Trust filed the current lawsuit

against Hardie in the Middle District of Florida.  (Frakes Buchanan Trust Decl.,

Ex. A, S. Buchanan Dep. 39-40; Second Peterson Decl., Ex. 1, R. Buchanan Dep.

52.)  (Civil File No. 12-1393)

     In 2013, the property was transferred out of the Buchanan Trust and to the

Buchanans' adult children, for estate planning purposes.  (Frakes Buchanan Trust

Decl., Ex. A, S. Buchanan Dep. 15-16; Frakes Buchanan Trust Decl., Ex. B, R.

Buchanan Dep. 10.)  The Buchanan Trust no longer owns the property and has

been terminated.  (S. Buchanan Dep. 15-17.)

     **B.     Choice of Law**

     The Buchanan Trust originally filed this lawsuit in the Middle District of

Florida.  Florida courts apply the "most significant relationship" test for

determining choice of law and, under that test, "[t]he state where the injury

occurred would, under most circumstances, be the decisive consideration in

determining the applicable choice of law."  Bishop v. Fla. Specialty Paint, Co., 389

So.2d 999, 1001 (Fla. 1980).  Because the Buchanan Trust filed suit in Florida; the

Buchanans reside in Florida; the house and siding are located in Florida; and any injury occurred in Florida, the Court will apply Florida law.

### C.    Summary of the Motion

The Buchanan Trust asserts four claims against Hardie: Count 1: Breach of Express Warranty; Count 4: Declaratory and Injunctive Relief; Count 5: Violations of the California UCL; and Count 12: Violations of the Florida Deceptive and Unfair Trade Practices Act.  Hardie moves for summary judgment on all four claims.

### D.    Count 1: Breach of Express Warranty

#### 1.    Standard for Breach of Warranty under Florida Law

Under Florida law:

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

Fla. Stat. § 672.313(1)(a).  Advertisements and brochures can create an express warranty.  See State Farm Ins. Co. v. Nu Prime Roll-a-Way of Miami, Inc., 557 So.2d 107, 108 (Fla. Ct. App. 1990).

### 2.   Informal Express Warranty

The Court grants summary judgment on the informal express warranty claim because Hardie never made an affirmation of fact or promise to the Buchanans that became part of the basis of any bargain and privity does not exist.

### a)   Whether an Informal Express Warranty Was Made to the Buchanans

Regardless of whether "reliance" is a required element of a Florida express warranty claim, a plaintiff must still prove that the manufacturer's statement was part of the basis of the bargain.  See, e.g., Carriuolo v. Gen. Motors LLC, No. 14-61429-CIV, 2015 WL 12434325, at *8 (S.D. Fla. July 9, 2015) ("Some conflict exists as to whether a claim for Breach of Express Warranty under Florida law requires a plaintiff to show that he relied upon the representation at issue as part of his prima facie case.  But in any event, a Defendant may defend against a Breach of Express Warranty claim by offering proof that the [statements] did not form part of the "basis of the bargain" for any given purchaser.") (citations omitted), aff'd, 823 F.3d 977 (11th Cir. 2016).  Here, the Buchanans both testified that they heard and saw no representations from Hardie before they installed Hardieplank.

Furthermore, absent an agency relationship, Hardie cannot be liable for the alleged statements of a third party or putative "intermediary," such as Berry.  See Ins. Co. of N. Am. v. Am. Marine Holdings, Inc., No. 504CV86OC10GRJ, 2005 WL 3158049, at *4 n.20, *9 (M.D. Fla. Nov. 28, 2005).  Here, Plaintiff fails to point to any evidence that an agency relationship existed between Hardie and Berry. "The party seeking to establish the existence of an agency relationship . . . bears the burden of proof."  Id. at *6 (citing Pinon v. Int'l Harvester Co., 390 So.2d 154, 154 (Fla. Ct. App. 1980)).  Thus, a plaintiff "must prove that (1) the principal acknowledges that the agent will act for it; (2) the agent accepts the undertaking; and (3) the principal controls the actions of the agent."  Id. (citations omitted).  In response to an interrogatory asking Plaintiff to identify each person who acted as a Hardie agent, the Buchanan Trust did not identify Berry.  (Frakes Buchanan Trust Decl., Ex. C, Buchanan Trust Response to Hardie's First Set of Interrogatories No. 7.)  Hardie also asked the Buchanan Trust to "identify any representations or statements purportedly made by that agent on behalf of James Hardie."  (Id.)  Plaintiff did not identify any statements.  (Id.)

The Buchanan Trust also fails to set forth any evidence to support the existence of an apparent agency relationship.  "Under the doctrine of apparent

authority, an agency will arise when the principal allows or causes others to believe that an individual has authority to conduct the act in question, inducing their detrimental reliance." Overseas Private Inv. Corp. v. Metro. Dade Cty., 47 F.3d 1111, 1114 (11th Cir. 1995) (citation omitted) (applying Florida law). The Buchanan Trust points to no evidence that Hardie represented to the Buchanans that Berry served as its agent or had authority to act on its behalf.

### b)      Privity

The Buchanan Trust's claim further fails for lack of privity. Florida requires privity for an express warranty claim, unless the manufacturer had direct contact with the buyer and made the representations upon which the buyer now relies or the manufacturer expressly extended its warranty to remote purchasers.

Under Florida law, "to recover for a breach of warranty, either express or implied, the plaintiff must be in privity of contract with the defendant." Levine v. Wyeth Inc., 684 F. Supp. 2d 1338, 1345 (M.D. Fla. 2010). See also Weiss v. Johansen, 898 So. 2d 1009, 1012 (Fla. Dist. Ct. App. 2005) ("[I]n order to recover for the breach of a warranty either express or implied, the plaintiff must be in privity of contract with the defendant."). "In limited circumstances, Florida

46

courts have found the privity requirement met without an actual contract between the manufacturer and the purchaser, where the manufacturer's representative had direct contacts with the purchaser which induced the purchaser to buy the product." Borchardt v. Mako Marine Int'l, Inc., No. 08-61199-CIV, 2011 WL 2084177, at *1 (S.D. Fla. May 24, 2011) (citations omitted). "Similarly, privity has been found where the manufacturer voluntarily extended the terms of an express warranty to remote buyers of the product, or where an assignment of warranty rights is implied." Id. (citations omitted). The direct contact exception to the privity requirement does not apply to the informal warranty claim because there is no evidence that a Hardie representative ever spoke with or made contact with the Buchanans. See Borchardt, 2011 WL 2084177, at *2 (dismissing breach of warranty claim for lack of privity because the complaint did "not allege direct contacts between defendants and plaintiffs which induced the sale"). In fact, the Buchanans admitted that they had no contact with Hardie and received no representations made by Hardie before purchasing their siding.

### 3.    Formal Express Warranty

The Court grants summary judgment on the formal express warranty claim.  As explained with respect to Plaintiff Swiencki, the Limited Warranty does not provide coverage for the design defect of warping alleged by Plaintiff. Additionally, the Buchanan Trust sued Hardie one week after submitting its warranty claim, so Hardie did not have the opportunity to consider the warranty claim.  Plaintiff has no evidence that Hardie did not or would not have honored the warranty.

### E.    Count 5: Violations of the California UCL

The Court grants summary judgment on the UCL claim because the UCL does not apply.  Plaintiff is a Florida resident who was injured in Florida and had no exposure to Hardie's marketing or representations before purchasing the siding, so Plaintiff cannot show that the challenged conduct emanated from California.  Furthermore, because the Buchanans did not see or rely on any marketing materials from Hardie before buying and installing the siding, they cannot show reliance.  No unfair practices claim exists because Plaintiff filed suit one week after submitting the warranty claim to Hardie, so there is no evidence of how Hardie would have handled the claim.

**F.    Count 12: Violations of the Florida Deceptive and Unfair Trade Practices Act**

A claim for damages under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-.213 ("FDUTPA") "has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So. 2d 1133, 1140 (Fla. Dist. Ct. App. 2008) (citations omitted). "[I]n order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." Macias v. HBC of Florida, Inc., 694 So. 2d 88, 90 (Fla. Dist. Ct. App. 1997) (citations omitted). "[W]here a plaintiff has not seen or heard an allegedly deceptive advertisement, she cannot challenge it under the FDUTPA." In re NJOY, Inc. Consumer Class Action Litig., 120 F. Supp. 3d 1050, 1089 (C.D. Cal. 2015) (citations omitted).

The FDUTPA claim fails because the Buchanans were never exposed to any of Hardie's allegedly deceptive marketing so they could not have been aggrieved by it. Furthermore, statements by an independent third party, such as Berry, cannot serve as the basis for a FDUTPA claim.

To the extent that Plaintiff's FDUPTPA claim is based on an allegation of unfair practices in handling its warranty claim, the Court also grants summary judgment to Hardie.  First, the Buchanans submitted a warranty claim to Hardie only one week before filing this lawsuit.  Hardie did not have the opportunity to process the warranty claim, and the claim was never rejected.  The Buchanans provide no basis to argue that their warranty claim was unfairly handled.  Second, in response to its interrogatory asking the Buchanan Trust to "identify by homeowner name each of the warranty claims that you allege were improperly handled" by Hardie, the Buchanan Trust did not identify its own claim.  (See Frakes Buchanan Trust Decl., Ex. C, Interrogatory No. 16.)  Because it did not identify its own claim as being mishandled, it cannot now assert a claim based on the purportedly unfair handling of its claim.

### G.    Count 4: Declaratory and Injunctive Relief

Because the Court grants summary judgment on all of Plaintiff's substantive claims, the request for declaratory and injunctive relief in Count 4 necessarily fails.  Additionally, because the Buchanan Trust no longer owns the property in question and has now been terminated, the Trust does not face a real or immediate threat of future injury.  See, e.g., Breakstone v. Caterpillar, Inc., No. 09-23324-CIV, 2010 WL 2164440, at *4 (S.D. Fla. May 26, 2010) (denying

motion for class certification of claim for injunctive relief when named plaintiff

had "sold his Caterpillar boat in 2007, and has no present personal stake in any

of the injunctive relief sought") (citation omitted).

## VII.   (DILLINGHAM: CALIFORNIA) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 320]

### A.   Facts Related to Plaintiff James Dillingham

In 2003, Charles Stanley purchased Hardieplank siding from Meek's

Lumber and had it installed on a house located in South Lake Tahoe, California.

([Docket No. 323] Frakes Dillingham Decl., Ex. A, Dillingham Dep. 39-42, 65;

Frakes Dillingham Decl., Ex. C.)

In October 2011, Plaintiff James Dillingham, along with his wife and

mother-in-law, purchased the house from Stanley as a vacation home, 8 years

after the siding had been installed.  (Dillingham Dep. 35-36.)  Dillingham is a

licensed professional engineer and construction contractor who has personally

installed exterior siding products, including fiber-cement siding.  (Dillingham

Dep. 17-21, 30-31.)  Before Dillingham purchased the South Lake Tahoe house, he

personally observed the "spalling" or delamination of the siding and he thought,

at the time, that there was a problem with the siding.  (Id. 43-44.)  He observed

that "[c]hunks of siding with the paint and underlayment [were] coming off"

"[a]ll over the house."  (<u>Id.</u> 44.)  Also, before the sale, Stanley "fully disclosed" to

Dillingham the problems with the siding, told him that it was "just going to keep

getting worse," and Stanley informed him that he had previously submitted a

warranty claim to Hardie.  (<u>Id.</u> 44-47.)  Stanley told Dillingham that he thought

the siding could not function "in a freeze/thaw environment."  (<u>Id.</u> 47.)  Stanley

said that he had reported the problem to Hardie, and Hardie had attributed the

problem to the "coating manufacturer."  ([Docket No. 375] Moreland Dillingham

Decl., Ex. 1, Dillingham Dep. 51-52; Moreland Dillingham Decl., Ex. 3,

Dillingham Answer to Interrogatory No. 7 at p. 9.)

At that time, Stanley also showed Dillingham a 50-year transferrable

warranty for the Hardieplank.  (Moreland Decl., Ex. 1, Dillingham Dep. 45.)

Dillingham thought that the Hardieplank would outlast its warranty and that, if

there were any problems, Hardie would take care of it.  (<u>Id.</u> 47-48, 127-28.)

Dillingham voluntarily chose to buy the house despite knowing of the siding

issues.  (Frakes Dillingham Decl., Ex. A, Dillingham Dep. 48-49.)

Within the first month after Dillingham bought the home, he called Hardie

about the siding.  (Moreland Dillingham Decl., Ex. 1, Dillingham Dep. 80.)  The

Hardie representative subjected him to "the most abrasive conversation I have

had in such a short amount of time."  (Dillingham Dep. 80-81.)  Dillingham told

the representative where the house was and the problems he had with the siding,

and the representative, "in a very aggressive manner," cited multiple warranty

exclusions and said that the siding must have been installed incorrectly.  (Id. 81.)

Dillingham testified that the employee "was so abrasive right off the start he

didn't even want the street address.  He wanted me off the phone is what he

wanted."  (Id. 81-82.)

Dillingham testified that he could not recall reviewing any particular

advertisement or marketing material from Hardie before purchasing the house.

(Frakes Dillingham Decl., Ex. A, Dillingham Dep. 58-59.)  He "[m]ost likely" had

reviewed Hardie product literature and viewed its web site, but he cannot recall

any particular statements, other than installation instructions for Artisan siding.

(Id. 59-62.)  He did not see any television commercials or hear any radio

advertisements about Hardie siding.  (Id. 63.)  He could not recall seeing any of

the statements from any of the advertisements described in the ACC.  (Frakes

Dillingham Decl., Ex. B, Dillingham Supp. Answer to Interrogatory No. 10.)

In 2009 or 2010, a Hardie sales representative cold called Dillingham to

solicit him to sell and install Hardie siding, and the two spoke for about 30

minutes.  (Frakes Dillingham Decl., Ex. A, Dillingham Dep. 56-57.)  During the

discussion, the Hardie representative gave Dillingham brochures and materials

for Hardieplank.  (Id. 58.)  Dillingham does not remember anything about the

product literature.  (Id.)  This discussion had no impact on Dillingham's decision

in 2011 to buy his house.  (Id. 57-58.)

In 2010, Dillingham visited Hardie's website because he was personally

installing a different Hardie fiber cement siding product, Artisan, on a different

structure that he owns in Placerville, California.  (Id. 32-33, 60-62.)  He only

looked at installation instructions and photographs of installation of Artisan

siding.  (Id. 60-62.)  Dillingham has had no problems with his Artisan siding and

is not making any claim against Hardie concerning that siding.  (Id. 32-33.)

On March 16, 2012, Dillingham filed suit against Hardie in the Eastern

District of California.  (Civil File No. 12-1496)

## B.   Choice of Law

Defendant's siding was installed on California resident Dillingham's house

in California in 2003, and Dillingham purchased the house from the original

owners in 2011.  The deterioration of the siding occurred while it was on the

house in California.  California applies the "governmental interest analysis."

McCann v. Foster Wheeler LLC, 225 P.3d 516, 527 (Cal. 2010).  The Court applies

California law because the "situs of the injury" is a relevant factor, <u>id.</u> at 530;

Dillingham is a California resident who brought suit in California; and the injury

occurred in California.

### C.    Summary of the Motion

Dillingham asserts four claims against Hardie, and Hardie now moves for

summary judgment on all four: Count 1: Breach of Express Warranty; Count 4:

Declaratory and Injunctive Relief; Count 5: Violations of the California UCL; and

Count 6: Violations of the California CLRA.

### D.    Count 1: Breach of Express Warranty

#### 1.    Standard for Breach of Express Warranty under California Law

California law provides: "Any affirmation of fact or promise made by the

seller to the buyer which relates to the goods and becomes part of the basis of the

bargain creates an express warranty that the goods shall conform to the

affirmation or promise."  Cal. Com. Code § 2313(1)(a).  "It is clear that statements

made by a manufacturer or retailer in an advertising brochure which is

disseminated to the consuming public in order to induce sales can create express

warranties."  <u>Keith v. Buchanan</u>, 220 Cal. Rptr. 392, 396 (Cal. Ct. App. 1985)

(citations omitted).

### 2.    Informal Express Warranty

### a)    Whether Hardie Made an Informal Express Warranty to Dillingham

Dillingham's breach of the informal express warranty claim fails because he was not in privity with Hardie and cannot establish that he reasonably relied on representations from Hardie.  As this Court previously stated in its July 2013 Order, "[t]o ultimately succeed on a California express warranty claim, either reliance or privity is required."  In re Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2013 WL 3717743, at *16 (D. Minn. July 15, 2013) (citations omitted).  See also Asghari v. Volkswagen Grp. of Am., Inc., 42 F. Supp. 3d 1306, 1334 (C.D. Cal. 2013) ("When there is no privity of contract, California law requires a showing that a plaintiff relied on an alleged warranty.") (citations omitted).

"A buyer and seller stand in privity only if they are in adjoining links of the distribution chain; an end consumer who buys products from a retailer is not in privity with the manufacturer of the products."  Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1082 (N.D. Cal. 2011).  Thus, there was no privity between Hardie and Dillingham, because Dillingham purchased the house from

56

Stanley.  Moreover, there was no privity between the Stanley and Hardie because Stanley purchased the siding from Meek's, not from Hardie.

Additionally, Dillingham cannot show reliance.  He cannot recall any particular advertisement, brochure, or marketing material that he reviewed before buying the house in 2011.  Dillingham testified that his contact with a Hardie sales representative did not have any impact on his decision in 2011 to buy the house.  He admitted that the web pages he reviewed on Hardie's website had nothing to do with the siding on the house he purchased.  Rather, he visited the website because he was installing a different Hardie siding product, Artisan, on a different structure that he owned.  Dillingham has not experienced any problems with his Artisan siding and is not asserting any claim regarding that siding.  Nor could he have reasonably relied on general product literature when he had specific knowledge of delamination issues with the Hardie siding on the house that he was purchasing.  Stanley told Dillingham that he thought the siding could not function in a freeze-thaw environment.  Stanley said that he had reported the problem to Hardie, and Hardie had attributed the problem to the coating manufacturer.

**b)      Statute of Limitations**

The Court further notes that Dillingham's claim is barred by the statute of limitations. Under California law, "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Cal. Com. Code. § 2725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Id.(2). "A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." Id.

Under the Uniform Commercial Code, the limitations period accrues at the time of delivery to the original purchaser of the product and does not start anew for subsequent purchasers. See, e.g., Fernandez v. Cent. Mine Equip. Co., 670 F. Supp. 2d 178, 189 (E.D.N.Y. 2009) (citations omitted) ("A cause of action accrues for purposes of a breach of warranty claim upon delivery of the product to the initial purchaser.") (citations omitted) (examining New York UCC); Wilson v. Harris Corp., No. CIV. 3-92-711, 1993 WL 724813, at *5 (D. Minn. Oct. 20, 1993) (citation omitted) ("The tender of delivery that begins the limitation period must be the tender made under the contract that has allegedly been breached;

subsequent sales will not revive a time-barred claim under an earlier contract.")
(examining Minnesota UCC).

The future performance exception, found in § 2725(2), "must be narrowly
construed, and [] it applies only when the seller has expressly agreed to warrant
its product <u>for a</u> <u>specific and defined period of time</u>."  <u>Cardinal Health 301, Inc.</u>
<u>v. Tyco Elecs. Corp.</u>, 87 Cal. Rptr. 3d 5, 16 (Cal. Ct. App. 2008) (emphasis in
original).  The exception "does not occur in the usual case, even though all
warranties in a sense apply to the future performance of goods."  <u>Carrau v.</u>
<u>Marvin Lumber & Cedar Co.</u>, 112 Cal. Rptr. 2d 869, 876 (Cal. Ct. App. 2001)
(footnote and citation omitted).  Thus,

> general assertions as to the performance or durability of a product,
> such as the assertions made by Marvin in its advertisements ["that
> Marvin's windows would be 'long-lasting,' even 'in the most
> challenging of climates,' and would provide the homeowner with an
> 'investment that will stand him in good stead for years to come'], do
> not explicitly extend to future performance of the product.

<u>Id.</u> at 874, 876.  Here, any breach of an informal express warranty accrued in 2003
upon delivery of the siding, unless the warranty fits within the future
performance exception.

The Court concludes that the future performance exception does not
apply.  Dillingham claims that Hardie consistently represented that Hardieplank

was covered by a 50-year warranty and that these representations were often

commingled with other statements relating to future performance, such as that

Hardieplank offered a "lifetime" of low maintenance. Hardie accurately

represented that Hardieplank was covered by a 50-year warranty – Dillingham

admits that he saw a copy of the Limited Warranty before he purchased his

house. As previously explained with regard to Plaintiff Kavianpour, the Court

holds that Hardie's statement in its advertising that its siding came with a 50-

year warranty does not constitute a warranty of future performance.

Additionally, "[v]ague statements concerning product longevity do not comply

with the requirement of a 'specific reference to a future time' that would create a

warranty of future performance." In re Hardieplank Fiber Cement Siding Litig.,

No. 12-MD-2359, 2014 WL 2987657, at *3 (D. Minn. June 30, 2014) (quoting Selzer

v. Brunsell Bros., 652 N.W.2d 806, 813 (Wisc. Ct. App. 2002)). Finally, Dillingham

points to no evidence that he received a representation that Hardie warranted a

lifetime of low maintenance. Because the future performance exception does not

apply, the statute of limitations expired in 2007, yet Dillingham did not file suit

until 2012. Therefore, his informal express warranty claim is barred by the

statute of limitations.

### 3.    Formal Express Warranty

For the reasons discussed with respect to Plaintiff Swiencki, the Court

holds that, under California law, the design defects alleged by Dillingham are

not covered the Limited Warranty.  See also Troup v. Toyota Motor Corp., 545 F.

App'x 668, 668 (9th Cir. 2013) ("The district court properly dismissed the Troups'

claim predicated on breach of an express warranty.  The Toyota Prius's alleged

design defect does not fall within the scope of Toyota's Basic Warranty against

"defects in materials or workmanship."  In California, express warranties

covering defects in materials and workmanship exclude defects in design.")

(citing Daugherty v. Am. Honda Motor Co., Inc., 51 Cal. Rptr. 3d 118 (Cal. Ct.

App. 2006)).  Moreover, the statute of limitations bars this claim because Stanley

noticed problems with the siding and made a warranty claim to Hardie

regarding those problems by 2005.  (Frakes Dillingham Decl., Ex. C-D.)  Thus, the

Court grants summary judgment with respect to the breach of the formal express

warranty claim.

### E.    Count 5: California UCL and Count 6: California CLRA

### 1.    Reliance

In order to have standing to bring a UCL [] or CLRA claim, Plaintiffs
must plead that they relied on the misleading materials.  A plaintiff
is not permitted to support a claim alleging misleading product

packaging with statements that he never read or relied upon when
making his purchase.

Bronson v. Johnson & Johnson, Inc., No. C 12-04184 CRB, 2013 WL 1629191, at *2

(N.D. Cal. Apr. 16, 2013) (citations omitted).  "[A] class representative proceeding

on a claim of misrepresentation as the basis of his or her UCL action must

demonstrate actual reliance on the allegedly deceptive or misleading statements,

in accordance with well-settled principles regarding the element of reliance in

ordinary fraud actions."  In re Tobacco II Cases, 207 P.3d 20, 25-26 (Cal. 2009).

Actual reliance must be "proved by showing that the defendant's

misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's

injury-producing conduct."  Id. at 39.

> It is not . . . necessary that [the plaintiff's] reliance upon the truth of
> the fraudulent misrepresentation be the sole or even the
> predominant or decisive factor influencing his conduct. . . .  It is
> enough that the representation has played a substantial part, and so
> had been a substantial factor, in influencing his decision.

Id. at 39 (citation omitted).  See also Figy v. Frito-Lay N. Am., Inc., 67 F. Supp. 3d

1075, 1088 (N.D. Cal. 2014) (California case law "require[s] named plaintiffs to

plead actual reliance on the misrepresentations at issue.").

Dillingham's UCL and CLRA claims failed because he did not actually rely

on any alleged misrepresentations by Hardie, as discussed with regard to Count

1.  Moreover, reliance cannot be implied when Dillingham explicitly testified that he did not rely on Hardie's representations when deciding whether to buy the house; Dillingham is a named plaintiff rather than a putative class member; and the representations made by Hardie varied over time.

### 2.      Unfair Conduct

The Court further grants summary judgment to Hardie to the extent that Dillingham's statutory claims are based on a theory of unfair handling of his warranty claim.  First, Dillingham did not submit a warranty claim to Hardie. (Second Frakes Dillingham Decl., Ex. H, Dillingham Dep. 83.)  Thus, Hardie did not have the opportunity to handle his warranty claim.  In fact, the former owner of the same house had submitted a warranty claim in 2005, and, in 2006, Hardie had made a goodwill payment of $9,500 in response.  (Frakes Dillingham Decl., Exs. C-D.)  Dillingham's claim is based on one short telephone call with an unnamed Hardie representative.  Even if the call was abrasive, Dillingham was not prevented from submitting a warranty claim.

Second, Dillingham responded to Hardie's interrogatory requesting that he "identify by homeowner name and each of the warranty claims that you allege were improperly handled" by Hardie and did not identify his own

warranty claim.  (Frakes Dillingham Decl., Ex. B, Dillingham Answer to

Interrogatory No. 16.)

### F.      Count 4: Declaratory and Injunctive Relief

Because the Court has dismissed Dillingham's substantive claims, Count 4

is dismissed.

## VIII.  (FENWICK: NEVADA) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 324]

### A.      Facts Related to Plaintiff Fenwick

In 2006, Plaintiff Hugh Fenwick paid Northstar Construction ("Northstar")

to build him a house in Carson City, Nevada.  ([Docket No. 327] Frakes Fenwick

Decl., Ex. B, Fenwick Answer to Interrogatory No. 2; Frakes Fenwick Decl., Ex. A,

Fenwick Dep. 15-16, 21-22.)  Northstar purchased Hardieplank siding for the

house from Meek's Lumber and Hardware in Carson City, Nevada, and installed

it on the house in September 2006.  (Fenwick Dep. 19-21; Fenwick Answer to

Interrogatory No. 2.)

Before the Hardieplank was installed, Fenwick never spoke with anyone

employed by Hardie; did not review a brochure or advertisement about Hardie

siding; did not visit Hardie's web site; and had not seen or heard television or

radio advertisements about Hardie siding. (Fenwick Dep. 25-28.)  He did not

"review any documents or information prior to the purchase of the siding," and had never heard of Hardie lap siding before going to Meek's in 2006. (Fenwick Answer to Interrogatory No. 1; Fenwick Dep. 27, 34-35.)

During Fenwick's deposition, he testified that he went to Meek's in 2005 or 2006 and spoke with a manager about Hardie siding. (Fenwick Dep. 25-26, 28-30.) The lumberyard manager "mentioned a warranty, and I remember thinking that's longer than I will be alive for. So that makes us happy." (Id. 28-30.) Fenwick also saw a wood display board that had lap siding samples on it. (Id. 29-30.) The siding pieces mostly filled the board and there was no room for any writing. (Id. 30-31.) Aside from the word "Hardie," Fenwick did not remember any words on the wood board. (Id.)

In an answer to an interrogatory, Fenwick stated that he saw that Hardie provided a 50-year warranty for the siding "on the wrapper that the James Hardie Siding he purchased came in, on a point-of-sale display at Meeks Construction [], and repeated to him [by] the manager of Meeks Construction." (Frakes Fenwick Decl., Ex. B, Fenwick Amended Answer to Interrogatory No. 11.) However, during his deposition, Fenwick testified that, after the Hardieplank was delivered to his new house, he walked by and saw the wrapper

sitting there. (Fenwick Dep. 87-89.) When asked if, when he completed that interrogatory answer, he recalled any words on the wrapper, he testified: "God, no." (Id. 89.)

In a September 2016 declaration completed after his December 2014 deposition, Fenwick claims that he purchased Hardieplank siding from Meek's lumberyard in August 2006. ([Docket No. 377] McShane Decl., Ex. 1, Fenwick Decl. ¶ 3.) He further claims that, before he bought the siding, he saw an in-store display that stated that Hardieplank was pre-stained and would never require painting. (Fenwick Decl. ¶ 4.) A Meek's employee told Fenwick that Hardieplank was covered by a 50-year warranty. (Id.) Fenwick chose the Hardieplank and believed that the warranty would continue "longer than I will be alive." (Id.; McShane Decl., Ex. 2, Fenwick Dep. 29.)

In October 2007, Fenwick noticed that the siding was starting to peel, crack, flake, and delaminate. (Frakes Fenwick Decl., Ex. A, Fenwick Dep. 35; Fenwick Decl. ¶ 5.) He contacted Meek's about the issues, and Meek's told him to contact Hardie. (Fenwick Decl. ¶ 6.) Before November 2007, Fenwick also contacted Northstar about the "problem" he saw and told Northstar: "There is something wrong with the siding, can you come and have a look." (Frakes

Fenwick Decl., Ex. A, Fenwick Dep. 80-81.)  In November and December 2007,

Northstar made some repairs by repainting portions of the siding.  (Id. 82.)

On August 1, 2008, Fenwick submitted a warranty claim to Hardie

asserting the following issue: "siding cracking & peeling many locations."

(McShane Decl., Ex. 4.)  On August 29, 2008, Hardie denied his claim on the

grounds that, based on the photographs submitted, the claim was not covered

because the warranty did not cover third-party coatings and only the paint had

failed.  (McShane Decl., Ex. 5.)  Fenwick asserts that, since 2008, boards that

originally showed no flaws have started to peel, crack, flake, blister, and

delaminate.  (Fenwick Decl. ¶¶ 9-10.)

On February 6, 2012, Fenwick filed a lawsuit against Hardie in the Central

District of California.  (Civil File No. 12-1391)

**B.    Choice of Law**

California applies the "governmental interest analysis."  McCann v. Foster

Wheeler LLC, 225 P.3d 516, 527 (Cal. 2010).  The Court applies Nevada law

because the "situs of the injury" is a relevant factor, id. at 530, Fenwick is a

Nevada resident; the siding was installed in Nevada; and the injury occurred in

Nevada.  Furthermore, the Hardieplank was purchased in Nevada and Fenwick

has never lived in California.  (Fenwick Dep. 147.)

### C.    Summary of the Motion

Fenwick asserts three claims against Hardie: Count 1: Breach of Express

Warranty; Count 4: Declaratory and Injunctive Relief; and Count 5: California

UCL.  Hardie moves for summary judgment on all three claims.

### D.    Count 1: Breach of Express Warranty

#### 1.    Informal Express Warranty

##### a)    Whether an Informal Express Warranty Was Made to Fenwick

The Court grants summary judgment because no informal express

warranty was made to Fenwick.  In his deposition, Fenwick admits that he was

never exposed to any marketing materials from Hardie and did not review any

documents or information before buying the siding.  The Nevada UCC provides

that an affirmation of fact or promise "made by the seller to the buyer which

relates to the goods and becomes part of the basis of the bargain creates an

express warranty."  Nev. Rev. Stat. § 104.2313(1)(a).  Here, no affirmation was

made by Hardie to Fenwick.  An oral statement by an employee of Meek's

lumberyard cannot be imputed to Hardie as an express warranty because

Fenwick fails to point to evidence to support an agency relationship between

Hardie and Meek's.  Moreover, in response to an interrogatory asking Fenwick to

identify Hardie's agents and their statements, Fenwick did not identify Meek's or

its employee.  (Frakes Fenwick Decl., Ex. B, Fenwick Answer to Interrogatory No. 7.)

Fenwick's recent declaration claiming that he saw a Hardie point-of-sale display at Meeks that represented that the siding would come pre-stained and would never require painting directly contradicts his interrogatory answer swearing that he did not review any documents or information before purchasing the siding and his deposition testimony that the wood point-of-sale display board that he saw had no room for any writing and that he did not remember any words on the wood board aside from, perhaps, the word "Hardie."  A plaintiff cannot create a genuine issue of material fact by contradicting his own prior sworn interrogatory answers and deposition testimony without explanation.

Finally, as the Court has previously explained, there is no evidence that Hardie breached a promise to provide a 50-year warranty with the siding – it is true that the siding did come with a 50-year warranty.

### b)    Statute of Limitations

Additionally, Fenwick's claim of breach of the informal express warranty is untimely.  The statute of limitations for breach of warranty is four years.  Nev.

Rev. Stat. § 104.2725(1).  A cause of action accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  Id.(2).  A breach of warranty "occurs when tender of delivery is made," except in instances "where a warranty explicitly extends to future performance of the goods," in which case the claim accrues when the "breach is or should have been discovered."  Id.

Fenwick's claim accrued upon delivery of the siding in 2006, unless the future performance exception applies.  Fenwick's informal warranty claim is based on the alleged promise that Hardieplank was "covered by" a 50-year warranty.  This is a promise about the present – whether the siding came with a 50-year warranty when sold – not about the future.  For the reasons previously explained, the future performance exception does not apply to this representation.

Equitable tolling does not apply to save Fenwick's claim.  Nevada allows equitable tolling to stop the running of the limitations period when the only bar to a timely filed claim is a procedural technicality, there is no danger of prejudice to the defendant, and the interest of justice require tolling.  State Dept. of

Taxation v. Masco Builder Cabinet Group, 265 P.3d 666, 671 (Nev. 2011).  When

determining whether equitable tolling applies, the Court considers:

> (1) the diligence of the claimant; (2) the claimant's knowledge of the
> relevant facts; (3) the claimant's reliance on authoritative statements
> . . . that misled the claimant about the nature of the claimant's rights;
> (4) any deception or false assurances on the part of [the] party
> against whom the claim is made; (5) the prejudice to the defendant
> that would actually result from delay during the time the limitations
> period is tolled; and (6) any other equitable considerations
> appropriate in the particular case.

Wisenbaker v. Farwell, 341 F. Supp. 2d 1160, 1166 (D. Nev. 2004) (citation

omitted).

First, there is no equitable tolling for a claim that is not subject to the

discovery rule.  Fenwick's breach of the informal express warranty claim accrued

at the time of delivery, regardless of his "lack of knowledge of the breach."  Nev.

Rev. Stat. § 104.2725(2).  See also Walters v. Pella Corp., No. 2:14-CV-00544-DCN,

2015 WL 2381335, at *8 (D.S.C. May 19, 2015) ("Nevada law is clear that a breach

of warranty accrues upon delivery and makes no mention of repair tolling.").

Additionally, Fenwick is not claiming that procedural technicality prevented him

from filing a timely claim.  And a manufacturer's denial of liability for a product

defect does not toll the limitations period.  See, e.g., Wieting Funeral Home of

Chilton, Inc. v. Meridian Mut. Ins. Co., 690 N.W.2d 442, 450 (Wisc. Ct. App. 2004)

71

(holding equitable tolling did not apply when, "[f]rom the very outset, [the defendant] was, in the trial court's words, 'up front' with its denial of [the plaintiffs'] roof damage claim"); <u>Oreck v. Harvey Homes, Inc.</u>, 602 N.W.2d 424, 429 (Minn. Ct. App. 1999) (holding that equitable tolling did not apply when "Harvey Homes consistently denied any responsibility for the air and water leakage and made no promises to repair the problems," stated that the defects in the windows were related to a stucco contractor, and suggested the plaintiffs contact that contractor) (applying Minnesota law).

Nor did Hardie have a duty to inform Fenwick that its siding was allegedly defective:

> In Nevada, the duty to disclose arises from the relationship between the parties.  A duty to disclose arises where there is a fiduciary relationship or where there is a "special relationship," such that the complaining party imparts special confidence in the defendant and the defendant reasonably knows of that confidence. . . . [S]imply manufacturing or selling an alleged defective product is not enough to support the required relationship.

<u>Peri & Sons Farms, Inc. v. Jain Irr., Inc.</u>, 933 F. Supp. 2d 1279, 1292 (D. Nev. 2013).

Thus, the limitations period is not tolled based on Hardie's alleged failure to disclose information to Fenwick.

### 2.    Formal Express Warranty

Fenwick's formal express warranty claim is barred by the 4-year statute of limitations under the Nevada UCC.  Nev. Rev. Stat. § 104.2725(1).  If the Limited Warranty is considered an express warranty of future performance, Fenwick's breach of warranty claim accrued when the "breach is or should have been discovered."  Id.(2).

Fenwick's claim for breach of the Limited Warranty accrued when Fenwick first noticed a problem with the siding in October 2007.  Fenwick does not dispute that this is when the claim accrued.  However, he asserts the same equitable tolling argument that he made with respect to his informal express warranty claim.  For the reasons previously explained, equitable tolling does not apply.  Thus, the four-year statute of limitations bars the formal express warranty claim.  Moreover, for the reasons explained with respect to Plaintiff Swiencki, the Limited Warranty does not cover Swiencki's design defect claims.

### E.    Count 5: California Unfair Competition Law

The Court holds that the UCL does not apply to Fenwick.  Fenwick is a Nevada resident, injured in Nevada.  He was not exposed to any representations from Hardie, let alone any statements emanating from California.  There is no basis for application of the UCL to Fenwick's allegations.

73

The Court further notes that, even if the UCL applied, to the extent it is based on misrepresentations, it would be barred by the statute of limitations. "Any action to enforce any cause of action [under the UCL] shall be commenced within four years after the cause of action accrued."  Cal. Bus. & Prof. Code § 17208; Aryeh v. Canon Bus. Solutions, Inc., 292 P.3d 871, 876 (Cal. 2013).  UCL deceptive practices act claims accrue "when a reasonable person would have discovered the factual basis for a claim."  Aryeh, 292 P.3d at 878 (quotation omitted).  Fenwick's UCL claim accrued by October 2007, when he discovered problems with the siding.  A manufacturer's denial of liability is not enough to toll the limitations period.  See Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 878 (8th Cir. 2000) ("Absent some duty to disclose, not present here, PPG was not required to inform Marvin of the facts that reflected poorly on PILT's performance.  PPG's denial of liability alone is certainly not fraudulent concealment.") (analyzing Minnesota law) (citations omitted); see also Matsumoto v. Republic Ins. Co., 792 F.2d 869, 872 (9th Cir. 1986) ("[A]n insurer's disclaimer, even if made through fraud or mistake, could not toll the statute of limitations.  Otherwise, warned the [California Supreme] [C]ourt, no insurer could deny liability without indefinitely suspending the running of the statute of

74

limitations.") (analyzing California insurance law) (citation omitted). Thus, the statute of limitations bars Fenwick's misrepresentation UCL claim.

As for the unfair practices claim, Fenwick argues that his UCL unfair practice claim accrued in August 2008, when his warranty claim was denied, so that portion of the claim is timely. However, in Fenwick's answer to Hardie's interrogatory asking him to identify each homeowner whose warranty claims were improperly handled by Hardie, Fenwick identified other individuals but did not identify himself. (Frakes Fenwick Decl., Ex. B, Fenwick Answer to Interrogatory No. 16 and Amended Answer to Interrogatory No. 16.) Because he did not identify his own claim as being mishandled, he cannot now assert a claim based on the purportedly unfair handling of his claim.

### F.    Count 4: Declaratory and Injunctive Relief

Because the Court has dismissed all of Fenwick's substantive claims, Hardie is entitled to summary judgment on Count 4.

## IX.    (BROWN, KOSTOS, TREECE: ILLINOIS) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 328]

### A.    Facts Related to Plaintiffs John Brown, Mark Kostos, and Richard Treece

### 1.    Facts Related to John Brown

In 2004, Plaintiff John Brown browsed siding selections at Stock Building Supply for his soon-to-be-built house located in Winthrop Harbor, Illinois. ([Docket No. 371] LaDuca Decl., Ex. 1, Brown Dep. 61-62; [Docket No. 332] Frakes Brown Decl., Ex. A, Brown Answer to Interrogatory No. 2.)  At Stock Building Supply, Brown picked up and reviewed a brochure for Hardie siding. (Frakes Brown Decl., Ex. B, Brown Dep. 87-88, 96.)  The brochure stated: "To prove the quality of our products, James Hardie backs most of its lap and panel siding with a 50-year limited transferable product warranty."  (LaDuca Decl., Ex. 2 at 23.)  It also stated, among other things, that Hardie could provide "a more substantial siding" – "[o]ne that provides durability and low-maintenance."  (Id.) Brown testified that the brochure described a "limited warranty."  (Frakes Brown Decl., Ex. B, Brown Dep. 95.)  He also testified that, in fact, the Hardieplank he purchased is covered by a 50-year warranty.  (Id. 124.)

At some point, Brown also spoke with Stock Building Supply salesman Ryan McMahon, who stated that Hardieplank was low maintenance and was covered by a 50-year warranty.  (Brown Dep. 81-82.)  Brown understood that McMahon was not a Hardie employee, and McMahon never told Brown that he was an agent of Hardie.  (Id. 85-86.)

Eventually, Brown chose Hardieplank, and its low maintenance and 50-year warranty were driving factors in his decision. (LaDuca Decl., Ex. 1, Brown Dep. 55-56, 82, 89-90.) On October 30, 2004, he purchased the Hardieplank from Stock Building Supply. (Brown Dep. 61-62.) When the Hardieplank was delivered to Brown's home, he received three limited warranties: one for Hardieplank, one for the ColorPlus finish on the siding, and one for the trim. (Frakes Brown Decl., Ex. B, Brown Dep. 103; Frakes Brown Decl., Exs. D, E. F.) These were the only warranties that Hardie gave to Brown in connection with the siding and trim and they are the only warranties that Brown claims Hardie breached. (Brown Dep. 105, 127.)

Brown never spoke with anyone at Hardie before he purchased the siding for his house. (Brown Dep. 82, 118.) Nor did he visit the Hardie website, hear a radio advertisement regarding the siding, or see a television advertisement regarding the siding. (Id. 118.)

In 2006 or 2007, Brown discovered fading problems with his siding. (Frakes Brown Decl., Ex. B, Brown Dep. 133-36.) By 2008, the fading eventually became so "ridiculous" and extreme that he discussed it with his wife. (Id. 133; LaDuca Decl., Ex. 1, Brown Dep. 132.) However, he did not raise any issues

about the fading with anyone because he is "a terrible procrastinator." (LaDuca Decl., Ex. 1, Brown Dep. 132.)

In 2011, Brown noticed that the Hardieplank was cracking and peeling. (LaDuca Decl., Ex. 1, Brown Dep. 180.) He submitted a warranty claim to Hardie in December 2011, stating that "most" of the Hardieplank on his home was affected, but not specifying the problem on the warranty form. (LaDuca Decl., Ex. 3.) In February 2012, Hardie offered Brown two proposals: $3,000 to repaint a portion of the Hardieplank and release his claim against Hardie and Hardie would remove and replace a 650 square foot portion of the Hardieplank on his home. (LaDuca Decl., Ex. 1, Brown Dep. 194-97; LaDuca Decl., Ex. 4; LaDuca Decl., Ex. 5.) Brown rejected both offers. (Brown Dep. 198-99.)

On September 11, 2012, Brown filed suit against Hardie in the Northern District of Illinois. (Civil File No. 12-2817)

### 2.  Facts Related to Mark Kostos

In 2010, Plaintiff Mark Kostos purchased a house in Yorkville, Illinois. (LaDuca Decl., Ex. 6, Kostos Dep. 23.) The house had been built in 2003. (Frakes Brown Decl., Ex. H, Kostos Inspection Report at 2.) At some point before Kostos purchased the house, Hardieplank had been installed on it, likely when the

78

house was built.  (Frakes Brown Decl., Ex. G, Kostos Dep. 28-29; LaDuca Decl.,

Ex. 6, Kostos Dep. 30.)  Kostos believes that the siding was sold by Pierce

Wholesale Roofing and Siding in Oswego, Illinois, but he does not know who

paid for the siding.  (Frakes Brown Decl., Ex. G, Kostos Dep. 109-10, 137.)

Before Kostos purchased the house, he had a home inspector inspect the

home on April 5, 2010; Kostos was present for the entire inspection.  (Frakes

Brown Decl., Ex. G, Kostos Dep. 36-37; Frakes Brown Decl., Ex. H, Kostos

Inspection Report.)  The inspection report stated that portions of the siding were

damaged, eroded, and pulling out at the bottom, and that repairs were needed.

(Kostos Dep. 41-42, 54-56, 59-60; Inspection Report at 8, 14.)  Kostos received the

report on April 5, 2010, and reviewed it before closing on the purchase of the

house.  (Kostos Dep. 39.)  The inspector orally told him that Hardieplank came

with a 50-year warranty and would "outlive" Kostos.  (LaDuca Decl., Ex. 6,

Kostos Dep. 34.)  Despite knowing of the damage to the siding, Kostos

voluntarily chose to purchase the house.  (Frakes Brown Decl., Ex. G, Kostos

Dep. 64.)

Before Kostos purchased the house, he did not speak to anyone from

Hardie, review any Hardie brochures, see any Hardie written advertisements, or

visit Hardie's website.  (Frakes Brown Decl., Ex. G, Kostos Dep. 66-67.)  Kostos

testified that he saw one or more television commercials about Hardie siding at

some point between 1998 and 2004.  (Id. 67.)  He recalls that the commercials

talked about the durability of Hardie siding and gave examples of the different

products that were available.  (Id. 68-69.)  He did not review or rely on anything

else related to Hardie siding before he purchased the house in 2010.  (Id. 71.)

Kostos moved into the house in May 2010. (LaDuca Decl., Ex. 6, Kostos

Dep. 112.)  The siding issues "got progressively worse to the point that [he] just

realized [he] needed to get some work done and get it fixed."  (Id. 161.)

In the fall of 2011, Kostos went onto the Hardie web site and saw

information about how to submit a warranty claim.  (LaDuca Decl., Ex. 6, Kostos

Dep. 103-04.)  He does not "recall [anything] in particular" that prompted him to

try to get the warranty form off of the web site.  (Id. 112.)  He called Hardie,

explained that he had Hardie siding on his house that had some problems that

needed repair, and requested information on how to file a warranty claim for the

siding.  (Id. 104-05.).  On November 2, 2011, Hardie emailed Kostos a packet with

the claim form and instructions on how to fill out a warranty claim.  (Id. 103-04.)

Kostos never submitted the warranty claim to Hardie. (Frakes Brown Decl., Ex. O, Kostos Dep. 111-12.) He agrees that Hardie never had the chance to fulfill the terms of the warranty and that he does not know how Hardie would have responded if he had sent in the warranty claim information. (Id.)

On March 16, 2012, Kostos filed suit against Hardie in the Northern District of Illinois. (Civil File No. 12-1497)

### 3.    Facts Related to Richard Treece

Plaintiff Richard Treece is co-trustee of the Treece Family Trust, which owns a commercial building located in West Frankfort, Illinois. (LaDuca Decl., Ex. 7, Treece Dep. 18.) The building was built in the 1950s. (Id. 31.)

In 2004, Treece was considering new siding for the front of the building and visited a Lowe's hardware store in Mt. Vernon, Illinois, where he spoke with a Lowe's employee who told him that Hardieplank came with a 50-year warranty and a "lifetime" warranty. (Frakes Brown Decl., Ex. I, Treece Dep. 31, 35, 49-50.) Treece did not seek clarification about which warranty length was correct. (Id. 49-50.) Hardie has never offered any siding product with a lifetime warranty. ([Docket No. 309] Klein Decl. ¶ 5.)

While at Lowe's, Treece also viewed a Hardie brochure that "showed the different styles and on the back it had the warranty information."  (Frakes Brown Decl., Ex. I, Treece Dep. 52.)  He cannot recall the specific words on the brochure but remembers that it "had a statement of the warranty on the back from what [he] remember[s]."  (Id. 53.)  The brochure was from a display with the Hardie logo on it.  (Id. 51-52.)

Treece testified that the Lowe's sales representative's statement that Hardieplank had a lifetime warranty was important to his purchasing decision.  (Frakes Brown Decl., Ex. I, Treece Dep. 134.)  He expected that Hardieplank would maintain its integrity and color for 50 years.  (LaDuca Decl., Ex. 7, Treece Dep. 122-23.)

Treece knew that Lowe's and Hardie were two separate entities and that Lowe's sales representatives are not Hardie employees, are not agents of every manufacturer whose products Lowe's sells, and are not speaking on behalf of every manufacturer of every product in the store.  (Frakes Brown Decl., Ex. I, Treece Dep. 50-51, 141-42.)

Treece never spoke to anyone at Hardie before buying Hardieplank.  (Frakes Brown Decl., Ex. I, Treece Dep. 67.)  Other than the Lowe's employee's

statement and the brochure at Lowe's, no other materials influenced Treece's

decision to purchase Hardieplank in 2004.  (Id. 66.)

In 2004, Treece purchased and installed Hardieplank from Lowe's on the

front of the building.  (Frakes Brown Decl., Ex. I, Treece Dep. 31, 35.)

During the summer of 2006, Treece saw that the Hardieplank was fading

and the boards were pulling apart from one another.  (Frakes Brown Decl., Ex. I,

Treece Dep. 76-77, 79-80.)  At that time, he believed that there was a problem

with the siding.  (Id. 78, 80-81.)  He relayed his concerns about the siding fading

to Lowe's several times that summer.  (Id. 89-90.)  Lowes gave him inaccurate

information.  (Id. 94.)  (The parties appear to agree that Treece testified that

Lowe's told Treece that because Hardieplank was installed on a commercial

structure, all Hardieplank warranties were void.)  Treece did not contact Hardie;

nor has he ever submitted a warranty claim to Hardie.  (Id. 94.)  He had no

interactions with Hardie before his filed this lawsuit in 2012.  (Id. 97.)

On June 27, 2012, Treece filed suit against Hardie in the Southern District

of Illinois. (Civil File No. 12-1669)

### B.   Choice of Law

Illinois applies the most significant relationship test.  See, e.g., Carris v.

Marriott Int'l, Inc., 466 F.3d 558, 560 (7th Cir. 2006).  Here, Brown, Kostos, and

Treece (collectively, the "Illinois Plaintiffs") are Illinois residents; they filed suit

in Illinois; the structures at issue are located in Illinois; and any injury occurred

in Illinois.  The Court will apply Illinois law to their claims.

### C.    Summary of the Motion

Brown asserts Count 1: Breach of Express Warranty[1]; and all Illinois

Plaintiffs assert Count 4: Declaratory and Injunctive Relief, and Count 5:

California UCL.  Hardie requests that the Court enter summary judgment in its

favor on all counts.

### D.    Count 1: Breach of Express Warranty (Brown Only)

#### 1.    Informal Express Warranty

##### a)    Whether an Informal Express Warranty Was Made to Brown

Under Illinois law:

> Any affirmation of fact or promise made by the seller to the buyer
> which relates to the goods and becomes part of the basis of the
> bargain creates an express warranty that the goods shall conform to
> the affirmation or promise.

810 Ill. Comp. Stat. 5/2-313(1).  "It is clear that documents and brochures may

constitute express warranties."  Crest Container Corp. v. R.H. Bishop Co., 445

N.E.2d 19, 24 (Ill. Ct. App. 1982).

---

[1] The Court previously dismissed Kostos' and Treece's breach of express
warranty claims.  ([MDL Docket No. 60] July 15, 2013 Order at 27.)

Brown argues that he was exposed to Hardie's informal express warranty before purchasing the siding when he received a Hardie brochure at the hardware store that promised that Hardieplank was low maintenance and covered by a 50-year warranty. He also points to the statements of the sales person at Stock Building Supply.

As to the representation that the siding would come with a 50-year warranty, Brown testified that the statement in the brochure was true – he did receive a 50-year limited warranty on the siding. (Frakes Brown Decl., Ex. B, Brown Dep. 124.) Therefore, he cannot assert a breach of informal express warranty based on the promise of a 50-year warranty.

As for Brown's new allegation that Hardie represented Hardieplank as "low maintenance" in the brochure, this assertion is contrary to both his deposition testimony and his answers to interrogatories identifying the only applicable warranty as the promise of a 50-year warranty. (See Brown Dep. 127; Frakes Brown Decl., Ex. M, Brown Amended Answer to Interrogatory No. 11 (identifying applicable warranty as warranty that the siding is covered by a 50-year warranty).) Even if the Court did consider Brown's new assertion that Hardie also breached its promise that the siding would provide durability and be

low-maintenance, the Court concludes that this representation is inactionable

puffery under Illinois law.

"'Puffing' denotes the exaggerations reasonably to be expected of a seller

as to the degree of quality of his or her product, the truth or falsity of which

cannot be precisely determined." Avery v. State Farm Mut. Auto. Ins. Co., 835

N.E.2d 801, 846 (Ill. 2005) (citation omitted). "Such statements include subjective

descriptions relating to quality" such as "expert workmanship," "custom

quality," "perfect," "magnificent," "comfortable," and "high performance

criteria." Id. (citations omitted). Statements that the siding is "low

maintenance," "durable," or would "retain its beauty" are non-actionable

puffery. See, e.g., Saltzman v. Pella Corp., No. 06 C 4481, 2007 WL 844883, at *4

(N.D. Ill. Mar. 20, 2007) (holding that, under Illinois law, statements that

windows are "'durable,' 'manufactured to high quality standards,' 'maintenance

free,' and that the company said that it would 'stand by its products'" constitute

puffery due to "[t]he subjective and non-quantifiable nature of these claims").

### b)    Statute of Limitations

Even if an informal express warranty were created and allegedly breached,

Brown's claim would be barred by the statute of limitations. Illinois sets a four-

year statute of limitations for warranty claims.  810 Ill. Comp. Stat. 5/2-725(1).  A

warranty claim accrues "when the breach occurs, regardless of the aggrieved

party's lack of knowledge of the breach."  Id. 5/2-725(2).  The breach "occurs

when tender of delivery is made," except in instances "where a warranty

explicitly extends to future performance of the goods," in which case, the claim

accrues "when the breach is or should have been discovered."  Id.  Thus, in this

case, the claim accrued in 2004, when the siding was delivered, unless the future

performance exception applies.

> Under Illinois law, the future performance exception has been
> narrowly construed, with emphasis on explicitly.  Not surprisingly,
> courts are reluctant to make inferences concerning warranty terms,
> when such terms are not clearly stated.  A promise must be tied to a
> specific time period or future date to fall within the exception to the
> general statute of limitations rule.

Outboard Marine Corp. v. Babcock Ind., Inc., No. 91 C 7247, 1994 WL 468596, at

*8 (N.D. Ill. Aug. 26, 1994) (citing Stumler v. Ferry–Morse Seed Co., 644 F.2d 667,

672 (7th Cir. 1981); Nelligan v. Tom Chaney Motors, Inc., 479 N.E.2d 439, 442 (Ill.

App. Ct. 1985)).  To be an explicit representation of future performance, the

"explicit" language must be "distinctly stated; plain in language; not ambiguous;

express; unequivocal."  Moorman Mfg. Co. v. Nat'l Tank Co., 435 N.E.2d 443, 454

(Ill. 1982) (citation omitted).  "The mere expectation that a product's warranty

extends for the life of the product does not delay the point at which the statute of limitations commences to run." Id.

None of the statements in the brochure viewed by Brown explicitly extend to future performance or guarantee that the siding will last for a particular number of years. The only mentions of a time period are 1) the statement that "Hardie has the ability to excite consumers with an exterior that retains its beauty for decades with very little care," and 2) the statement that the siding had a "50-year limited transferable product warranty." (Frakes Brown Decl., Ex. C.) The statement that the siding would "retain its beauty for decades with very little care" is too vague to constitute a future performance warranty. See, e.g., Cooper Power Sys., Inc. v. Union Carbide Chemicals & Plastics Co., 123 F.3d 675, 684 (7th Cir. 1997) (holding that, under Ohio law, statement that "vinyl paints maintain their good appearance for 'many years'" cannot constitute a warranty of future performance). As to the second statement, Brown admitted that, in fact, the siding did come with a 50-year warranty and that he understood that the siding only came with a "limited" product warranty. (Frakes Brown Decl., Ex. B, Brown Dep. 95, 124.) As the Court has previously explained, the future performance exception does not apply to a promise that a product comes with a

warranty of a particular length.  Generally, a statement that the siding was "low maintenance" does not constitute a warranty of future performance because it does not contain a specific reference to a future time.  See Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280, 291 (3d Cir. 1980) (analyzing Illinois law and holding that product literature that stated that asbestos roofs require "minimum maintenance" did not constitute a warranty of future performance).

Finally, even if the future performance exception applied, Brown testified that he observed fading in 2006 or 2007, but failed to file suit until 2012, more than 4 years later.  The defect was not latent because Brown saw it on the exterior of his home in 2006 or 2007.  Under Illinois law's version of the discovery rule, a cause of action "accrues when the plaintiff knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused."  Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 441 (7th Cir. 1994) (ruling on accrual of cause of action under Illinois Consumer Fraud Act).  "At that point the burden is upon the injured person to inquire further as to the existence of a cause of action."  Knox Coll. v. Celotex Corp., 430 N.E.2d 976, 980 (Ill. 1981) (citation omitted).

### 2. Formal Express Warranty

As discussed with regard to Plaintiff Swiencki, the Court holds that the Limited Warranty does not cover design defects.  See also Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 520, 527 (7th Cir. 2003) (holding that, under Illinois law, warranty for product that is "defective in material or workmanship" does not cover design defect); Hasek v. DaimlerChrysler Corp., 745 N.E.2d 627, 635 (Ill. Ct. App. 2001) (stating warranty that covered parts "defective in material, workmanship or factory preparation" did not cover design defect). Thus, Hardie is entitled to summary judgment on the breach of formal express warranty claim.

Additionally, the claim is barred by the statute of limitations.  The Limited Warranty is one of future performance, so the action accrues under the discovery rule.  Brown stated that he first discovered a problem of defect in the Hardieplank when he saw fading in 2006 or 2007.  The four-year statute of limitations accrued in 2007 and expired in 2011, but Brown did not file suit until 2012.

### E. Count 5: California UCL

### 1. Actionable Representations

### a) Brown

90

As discussed with regard to the breach of informal express warranty claim, Hardie made no actionable misrepresentation with regard to Brown. And Hardie is not liable for statements made by unrelated third parties or through vicarious liability. See, e.g., Emery v. Visa Int'l Serv. Ass'n, 116 Cal. Rptr. 2d 25, 33 (Cal. Ct. App. 2002).

### b)    Kostos

Kostos cannot base a UCL claim on the true statement that the siding is covered by a 50-year warranty. For the reasons explained with respect to Plaintiff Kavianpour, the Court holds that Kostos cannot base a claim on signal theory – the theory that a promise that Hardieplank was covered by a 50-year warranty can reasonably be construed as a representation of Hardieplank's useful life.

The statement that the siding would "outlive" him was made by a home inspector that Kostos hired, not by Hardie or its agent. Hardie is not liable for statements made by unrelated third parties. See, e.g., Emery, 116 Cal. Rptr. 2d at 33. Finally, Kostos cannot show reasonable reliance on statements about durability that he heard in advertisements many years before he purchased the

house, because when Kostos purchased the house he knew that the siding was already damaged, deteriorated, and eroded.

### c)    Treece

Treece cannot point to a statement by Hardie on which he relied.  Treece claims that he bought Hardieplank because he expected it to last for decades based on its 50-year warranty.  (Treece Dep. 122-23.)  For the reasons previously explained, the Court rejects signal theory.  A statement that Hardieplank came with a 50-year warranty was true.  Statements by a Lowe's sales representative that Hardieplank had a lifetime or 50-year warranty are not attributable to Hardie.  See, e.g., Emery, 116 Cal. Rptr. 2d at 33.

### 2.    Unfair Practices Theory

The Court further holds that Hardie is entitled to summary judgment to the extent the Illinois Plaintiffs' claims are based on an unfair practices theory.

Treece admits that he did not submit a warranty claim to Hardie, so he cannot pursue a claim that Hardie unfairly handled his warranty claim.  Similarly, Kostos testified that he never actually submitted a warranty claim to Hardie.  He further testified that, because he never submitted a warranty claim to

Hardie, it never had a chance to fulfill the terms of the warranty. Hardie could not have unfairly handled a non-existent claim.

Brown did pursue warranty relief from Hardie. Hardie offered to repaint the siding and/or replace a part of it. Brown found these offers inadequate and concludes Hardie effectively denied him relief under the warranty. However, in response to interrogatories asking Brown to "identify by homeowner name each of the warranty claims that you allege were improperly handled" by Hardie, Brown identified certain persons but did not identify himself. (Frakes Brown Decl., Ex. M, Amended Answer to Interrogatory No. 16.) Thus, he is barred from now claiming that his claim was unfairly handled.

Moreover, Brown fails to point to evidence that Hardie's response to his warranty claim was anything more than a simple breach of warranty. Initially, the Court notes that the Limited Warranty does not provide coverage for design defects. Additionally, Hardie offered to have a contractor replace the affected siding and reimburse Brown $3,000. Brown declined Hardie's offer because he wanted them to replace all of the siding – something he admitted was not required by the warranty. (Frakes Brown Decl., Ex. R, Brown Dep. 206.) He has not offered any evidence as to how his warranty claim was mishandled. Even if

Hardie's claim determination were wrong, it would have breached the contract but, without further evidence of wrongdoing, it could not have violated the UCL. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1152 (9th Cir. 2008) (acknowledging that "[a] breach of contract may form the predicate for a section 17200 claim, provided it also constitutes conduct that is unlawful, or unfair, or fraudulent," but dismissing claim when plaintiff "has not pled that the breaches of contract are independently unlawful, unfair, or fraudulent") (citation omitted).

### F.    Count 4: Declaratory and Injunctive Relief

Because the Court has granted summary judgment on all of the Illinois Plaintiffs' substantive claims, Hardie is entitled to summary judgment on Count 4.

## X.    (BETHEL: OHIO) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 333]

### A.    Facts Related to Plaintiff Brian Bethel

Plaintiff Brian Bethel is an Ohio resident.  In 2011, he purchased a house in Lebanon, Ohio, that had been built in "approximately 2000 or 2001."  ([Docket No. 336] Frakes Bethel Decl., Ex. A, Bethel's Answer to Interrogatory No. 2; Frakes Bethel Decl., Ex. B, Bethel Dep. 18.)  Hardieplank had been installed

during the home's original construction in 2000 or 2001.  (Bethel's Answer to

Interrogatory No. 2.)

Before Bethel bought the home, he hired a home inspector to inspect the

house on January 25, 2011.  (Bethel Dep. 26; Frakes Bethel Decl., Ex. C, Inspection

Report.)  Before closing on the house, Bethel reviewed the inspection report and

discussed the issues in the report with the inspector by telephone.  (Bethel Dep.

26-28.)  The inspection report stated that the Hardieplank was solid but that there

was "gapping observed at joints."  (Bethel Dep. 33-34; Inspection Report at 12.)

The inspector recommended "sealing these areas to prevent possible water

penetration and damage."  (Bethel Dep. 34; Inspection Report at 12.)  Bethel

thought that the gapping was a "relatively minor issue."  (Bethel Dep. 34.)  He

chose to buy the house despite knowing of the gaps; however, as of November

2014, he had not yet sealed the gaps to prevent possible water penetration and

damage.  (Id. 35, 38, 142-43.)

Before Bethel bought the house, he reviewed Hardie's website "relatively

quickly" and give it a "quick once over."  (Bethel Dep. 62-63.)  Bethel remembers

seeing statements during his review of the website regarding the 50-year

warranty and other statements such as that "it holds up to anything, it doesn't

rot, doesn't burn, bugs don't eat it, stands up to hot temperatures, cold temperatures." (Id. 62-63.)

Before Bethel bought the house, he never spoke with anyone employed by Hardie; did not review any brochure or advertisement about Hardieplank; and did not see or hear any Hardie radio or television advertisement. (Bethel Dep. 54-55.)

Bethel first noticed that the siding was shrinking in January 2011, that it was cracking in May or June 2012, and that it was loosening from its fasters, sagging, and warping in May or June 2012. (Frakes Bethel Decl., Ex. A, Bethel Answer to Interrogatory No. 5.)

On July 5, 2012, Bethel submitted a warranty claim to Hardie. ([Docket No. 367] First Peterson Decl., Ex. 2 at 184-85.) He reported that the siding was "shrinking and or sagging" and that "[i]n other spots, the paint is peeling off and the plank is breaking apart." (Id.)

On September 10, 2012, Hardie offered to replace up to 1,000 square feet of the Hardieplank and to paint the remainder of the siding. (First Peterson Decl., Ex. 2 at 255.) Bethel rejected Hardie's proposal because he thought that it would not resolve the pervasive failures of his Hardieplank; and because he interpreted

the offer to mean that Hardie "would consider the claim closed and no other damages could be filed." (First Peterson Decl., Ex. 1, Bethel Dep. 181-84, 189-90.)

On October 2, 2012, Bethel filed suit against Hardie in the Southern District of Ohio. (Civil File No. 12-2728)

## B.     Choice of Law

Ohio applies the "most significant relationship" test and "the law of the place of injury controls unless another jurisdiction has a more significant relationship to the lawsuit." Pilgrim v. Univ. Health Card, LLC, 660 F.3d 943, 946 (6th Cir. 2011) (citation omitted). The Court applies Ohio law because Bethel is an Ohio resident, his home and the Hardieplank are located in Ohio, and his injury occurred in Ohio.

## C.     Summary of the Motion

Bethel asserts four counts against Hardie: Count 1: Breach of Express Warranty; Count 4: Declaratory and Injunctive Relief: Count 5: Violation of the California UCL; and Count 9: Violation of the Ohio Consumer Sales Practices Act. Hardie moves for summary judgment on all four counts.

## D.     Count 1: Breach of Express Warranty

### 1.    Informal Express Warranty

Under Ohio law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  Ohio Rev. Code § 1302.26(A)(1).  Marketing and advertising representations can establish an express warranty.  See McKinney v. Bayer Corp., 744 F. Supp. 2d 733, 755 (N.D. Ohio 2010) ("The totality of the circumstances under which a product is purchased, which may include advertising which is external to the product packaging itself, must be assessed by the trier of fact before the question of whether a warranty exists (or was breached) can be determined.").

Bethel asserts that Hardie breached the following informal express warranties: Hardieplank is "covered by a 50-year warranty;" Hardieplank "resists hot and cold temperatures;" and Hardieplank is "superior to wood and vinyl" siding.  ([Docket No. 366] Bethel Opposition Brief at 15.)  Bethel argues that these Hardie statements that he saw in 2011 on its website are substantially similar to statements Hardie made in 2001 and 2002, when the original homeowners chose Hardieplank for their house.  Bethel concludes that Hardie

consistently communicated these warranties in order to successfully influence

the behavior of Bethel and other consumers.

### a)   Whether Hardie Made an Informal Express Warranty to Bethel

Hardie never entered into a bargain with Bethel involving the sale of

siding, yet the statute requires an affirmation of fact or promise made "by the

seller to the buyer" that "becomes part of the basis of the bargain."  Hardie could

not have made a representation that became part of the basis of the bargain with

Bethel because the previous owners of his house had purchased and installed the

Hardieplank more than 10 years before Bethel bought the house.  See Lester v.

Wow Car Co., No. 2:11-CV-850, 2014 WL 2567087, at *6 (S.D. Ohio June 6, 2014),

aff'd, 601 F. App'x 399 (6th Cir. 2015) ("[T]he service contract/warranty

application cannot form the basis for an express warranty claim, as the

statements in the application were made to a third-party, Coast to Coast, and not

to Plaintiffs."); McKinney v. Bayer Corp., 744 F. Supp. 2d 733, 754 (N.D. Ohio

2010) ("The existence of a warranty, standing alone, is insufficient to sustain an

action for breach of an express warranty.  Instead, the warranty must be part of

the basis of the bargain.  A warranty is the basis of the bargain if it has been

relied upon as one of the inducements for purchasing the product.") (citations omitted).

Bethel bought the house in 2011. The siding on the house had been purchased and installed by 2001 by someone other than Bethel. Bethel saw nothing from Hardie before the sale of the siding in 2000 or 2001. Thus, Hardie had no bargain with Bethel involving the sale and purchase of the siding.

Additionally, there is no evidence that any of the alleged informal warranties were ever made to the original purchasers. Nor is there any evidence that Hardie made any representations that induced the original purchasers to buy Hardieplank. In sum, there is no evidence of any statements by Hardie that became part of the basis of the bargain.

### b) Whether Hardie Breached an Informal Express Warranty to Bethel

Even if the representations at issue were part of the basis for the bargain, Hardie would be entitled to summary judgment. There is no evidence that Hardie breached a purported informal warranty that Hardieplank is covered by a 50-year warranty. It is undisputed that Bethel did receive the 50-year transferrable warranty because he was the first transferee of the warranty. In fact, Bethel submitted a warranty claim to Hardie under the Limited Warranty.

100

Bethel also claims that he viewed a statement on Hardie's website that Hardieplank is "superior to wood or vinyl." However, during Bethel's deposition, he did not testify that he had seen such a statement; rather, he testified that he saw a statement that Hardie had a 50-year warranty which, to him, meant that "[i]t should be a superior product compared to, let's say, wood or vinyl." (Frakes Bethel Dep., Ex. B, Bethel Dep. 63.)

Furthermore, even if Hardie made representations that its siding "resists hot and cold temperatures" and is "superior to wood or vinyl," these representations are inactionable puffery. "'Puffery' is generally defined as exaggerated blustering or subjective boasting upon which no reasonable consumer would rely." Davis v. Byers Volvo, No. 11CA817, 2012 WL 691757, at *8 (Ohio Ct. App. Feb. 24, 2012) (citation omitted).

### 2.    Formal Express Warranty

As the Court has previously explained, the Limited Warranty does not cover a design defect. See also, e.g., Whitt v. Mazda Motor of Am., Inc., 2011 WL 2520147, at *3-4 (Ohio Ct. App. June 20, 2011) (holding that, under Ohio law, a warranty that a product is "free from defects in material or workmanship" does

not cover a design defect).  Thus, Hardie is entitled to summary judgment on the

formal express warranty claim.

### E.     Count 5: California Unfair Competition Law

#### 1.     Application of the UCL to Bethel

The Court applies Ohio choice of law in Bethel's case.  As the Sixth Circuit

has noted, when determining what state's consumer protection law applies:

> Ohio's choice-of-law rules determine which consumer-protection
> laws cover these claims.  Under those rules, the law of the place of
> injury controls unless another jurisdiction has a more significant
> relationship to the lawsuit.

Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 946 (6th Cir. 2011) (citations

omitted).  Bethel is an Ohio resident, he was injured in Ohio, and the siding was

installed in Ohio on an Ohio property.  The Court concludes that an Ohio court

would apply Ohio, not California, consumer protection law.

#### 2.     Actionable Representations

Even if the UCL did apply to Bethel, Hardie would be entitled to summary

judgment because, as explained with respect to the informal express warranty

claim, Bethel cannot show that Hardie communicated misleading statements

upon which he relied.  As previously explained, the statement that Hardieplank

was covered by a 50-year warranty was true.  Bethel's testimony reveals that he

102

does not actually allege that Hardie stated that Hardieplank is "superior to wood and vinyl" siding.  Additionally, statements that Hardieplank is "superior to wood and vinyl" siding and that it "resists hot and cold temperatures" are puffery.  "Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable [under the UCL]."  <u>Azoulai v. BMW of N. Am. LLC</u>, No. 16-CV-00589-BLF, 2017 WL 1354781, at *8 (N.D. Cal. Apr. 13, 2017) (citations omitted).

 Finally, as explained with respect to Plaintiff Dillingham, reliance is required for the UCL claim to the extent it is based on fraudulent conduct.  Bethel could not have reasonably relied on any statements by Hardie to believe that the siding would not gap because he admitted that he had knowledge of the gapping in the siding before he chose to purchase the home.

### 3.    Unfair Conduct Theory

Even if the UCL applied to Bethel, Hardie would be entitled to summary judgment on Bethel's UCL claim to the extent that it is based on Hardie's unfair handling of his warranty claims.  First, in response to Hardie's interrogatories, Bethel identified homeowners whose warranty claims were mishandled by Hardie, but did not identify himself.  (Frakes Bethel Decl., Ex. A, Bethel

Amended Answer to Interrogatory No. 16.)  Second, the Limited Warranty does not provide coverage for design defects.  Third, Bethel cannot show that Hardie acted unfairly beyond allegedly breaching the warranty.

### F.    Count 9: Ohio Consumer Sales Practices Act

The Ohio Consumer Sales Practices Act ("OCSPA") provides:

> No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.  Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

Ohio Rev. Code § 1345.02(A).

### 1.    Consumer Transaction

Bethel's OCSPA claim fails because Bethel never entered into a "consumer transaction" with Hardie.  The OCSPA prohibits a supplier from committing "an unfair or deceptive act or practice in connection with a consumer transaction," Ohio Rev. Code. § 1345.02(A), and defines a "consumer transaction" as the "sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household," id. § 1345.01(A).  A "consumer" is a "person who engages in a consumer transaction with a supplier."  Id.(D).

There was no transfer of goods or services between Hardie and Bethel.

Bethel did not purchase siding; he purchased a house.  As discussed with respect

to Plaintiff Kavianpour's claims under the Virginia Consumer Protection Act, the

OCSPA does not encompass transactions in which building products are first

sold to an intermediary, such as a contractor, and then used as components in

larger construction projects.  And, unlike in the Nee case, Bethel did not accept a

product or service from Hardie in relation to his warranty claim.  Because no

consumer transaction occurred, the OCSPA claim must be dismissed.  See Floyd

v. Bank of Am., N.A., No. 1:13-CV-2072, 2014 WL 3732591, at *7 (N.D. Ohio July

25, 2014) (dismissing OCSPA claim when plaintiffs "have not shown that a

consumer transaction has occurred").  Cf. Nee v. State Indus., Inc., 3 N.E.3d 1290,

1306 (Ohio Ct. App. 2013) (holding that a plaintiff who buys a house from the

person who originally bought the good at issue (a water heater) is not a

"consumer" involved in a "consumer transaction" with respect to the original

sale of the water heater, although a consumer transaction did arise when the

plaintiff later sought to enforce the warranty on the water heater and the seller

committed an "other transfer" by giving him a replacement water heater for

"primarily personal, family, or household" purposes).

### 2.      Statute of Limitations

The Court further notes that, to the extent Bethel's OCSPA claim is based on an alleged design defect or any alleged misrepresentation, the claim is time-barred because the siding was installed in 2000 or 2001, and Bethel did not file suit until 2012.  Ohio sets a two-year statute of limitations under OCSPA, which accrues on "the occurrence of the violation."  Ohio Rev. Code § 1345.10(C).  "Where a plaintiff seeks recovery of damages under the CSPA, the limitations period is absolute, and the discovery rule does not apply."  Zaremba v. Marvin Lumber & Cedar Co., 458 F. Supp. 2d 545, 552 (N.D. Ohio 2006) (citing Lloyd v. Buick Youngstown GMC, 686 N.E.2d 350 (Ohio Ct. App. 1996)).

### G.      Count 4: Declaratory and Injunctive Relief

Because the Court has dismissed Bethel's substantive claims, Hardie is entitled to summary judgment on Count 4.

## XI.      (BOWERS: MINNESOTA) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 337]

### A.      Facts Related to Plaintiff Jonathan Bowers

Plaintiff Jonathan Bowers is a Minnesota resident who, in 2002, purchased a vacant lot located in Zimmerman, Minnesota.  ([Docket No. 340] Frakes Bowers Decl., Ex. A, Bowers Dep. 16.)  From 2002 through March 2003, he had a home built on the lot.  (Id. 25-26.)  On September 5, 2002, Bowers' builder, Morning Star

106

Homes, Inc., purchased Hardieplank siding for the house from Oak Grove Stock Building Supply.  (<u>Id.</u> 16, 24-25.)  Bowers directed his builder to buy Hardieplank because he heard about it on the radio and "wanted something as close to worry-free, maintenance-free as [he] could get, and as far away from vinyl as [he] could get." ([Docket No. 369] Moreland Decl., Ex. 1, Bowers Dep. 22.)  He also testified: "It's a great warranty.  50 years is awesome.  That's what sold me on the product."  (<u>Id.</u> 132.)

At least three years before Bowers built his home, he "continually" heard radio advertisements for Hardieplank on AM 1500 KSTP in Minnesota. (Moreland Decl., Ex. 1, Bowers Dep. 22, 32, 35, 153-54.)  He remembers that the advertisements generally stated that the siding was cement siding that was "maintenance-free" and "lasted for 50 years."  (<u>Id.</u> 33.)  He did not remember the word "warranty" being used in the ads.  (<u>Id.</u>)

Around the time that Bowers directed his builder to purchase Hardieplank, he picked up a Hardieplank brochure from the lumberyard. (Moreland Decl., Ex. 1, Bowers Dep. 34-35.)  He recalls that the brochure mentioned a 50-year warranty.  (<u>Id.</u> 153.)  He is not sure if he viewed the brochure before or after the Hardieplank was purchased.  (<u>Id.</u> 34-36.)

Before Bowers' builder purchased the siding, Bowers had never spoken to Hardie, seen Hardie brochures or any other written advertisement (apart from possibly the aforementioned brochure), seen Hardie television commercials, or visited Hardie's website.  (Bowers Dep. 30-31, 34-35.)

In 2007, Bowers noticed "shrinkage" and "disintegration" of siding boards.  (Moreland Decl., Ex. 1, Bowers Dep. 39-40; Frakes Bowers Decl., Ex. C, Bowers' Answer to Interrogatory No. 5.)  He "had no idea" whether the shrinkage was normal for siding and "didn't know if it was a problem."  (Bowers Dep. 40.)  In 2007, he saw the disintegration "as a problem" and believed that the siding had "failed in some way to be the product that I thought I had bought."  (Bowers Dep. 41-42.)  Boards near the ground had expanded, and the paint had peeled off.  (Id. 41.)

In the summer of 2007, Bowers spoke with a company called John Haley #1 Roofer because he "was looking for someone to come and replace the damaged siding."  (Bowers Dep. 45-46.)  He also spoke to his wife about his concerns.  (Id. 52-54.)

In 2007, Bowers contacted Hardie by telephone to ask for advice and to ask a representative to inspect the siding.  (Moreland Decl., Ex. 1, Bowers Dep. 42,

49-50.)  He asked Hardie whether the shrinkage was normal.  (Id. 42.)  He did not

mention the disintegration.  (Id.)  The Hardie representative repeatedly told him

that Hardieplank does not shrink and said that there was no Hardie

representative in the area who could come look at his house.  (Id. 43-45, 49-50.)

Bowers' only contact with Hardie was in 2007.  (Frakes Bowers Decl., Ex. A,

Bowers Dep. 90.)

After a storm in 2010, Bowers asked a contractor to inspect the

Hardieplank.  The contractor noted "bubbling" on the Hardieplank.  (Bowers

Dep. 83, 86, 123-28.)  Bowers believed that the bubbling was not limited to the

paint but was in the Hardieplank substrate.  (Id. 84-85.)  The contractor told

Bowers about this lawsuit and Bowers learned that there was "an issue" and "a

problem" with Hardieplank.  (Id. 164.)

There is no evidence that Bowers ever submitted a warranty claim to

Hardie.  (Frakes Bowers Decl., Ex. A, Bowers Dep. 91.)

On March 22, 2012, Bowers filed suit against Hardie in the District of

Minnesota.  (Civil File No. 12-727)

## B.    Choice of Law

The Court applies Minnesota law because, under Minnesota's "significant

contacts test," Nodak Mut. Ins. v. Am. Family Mut. Ins., 604 N.W.2d 91, 94, 96

(Minn. 2000), Bowers is a Minnesota resident, the Hardieplank was purchased in Minnesota and installed on a structure in Minnesota, and the alleged injuries occurred in Minnesota.

### C.    Summary of the Motion

Bowers asserts five claims against Hardie: Count 1: Breach of Express Warranty; Count 4: Declaratory and Injunctive Relief; Count 5: Violation of the California UCL; Count 7: Violation of the Minnesota Unlawful Trade Practices Act; and Count 8: Violation of the Minnesota False Statements in Advertising Act.  Hardie seeks summary judgment in its favor on all claims.

### D.    Minnesota Statute of Limitations

"A federal court sitting in diversity applies the statute-of-limitations rules of the forum."  Great Plains Trust Co. v. Union Pac. R.R. Co., 492 F.3d 986, 992 (8th Cir. 2007).  Minnesota Statute § 541.051, subdivision 1(a) provides:

> Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property or against the owner of the real property more than two years after discovery of the injury, nor in any event shall such a cause of action accrue more than ten years after substantial completion of the construction.

"[A] cause of action accrues upon discovery of the injury." Id. § 541.051, subd. 1(c).

### 1.      Applicability of the Two-Year Statute of Limitations

The two-year statute of limitations applies to all of Bowers' Minnesota claims because Bowers' claims seek "to recover damages for any injury to property . . . arising out of the defective and unsafe condition of an improvement to real property." Minn. Stat. § 541.051, subd.1.

The Minnesota Supreme Court has explicitly held that a defect in a building product that "fails to provide the expected barrier against unwanted elements such as rain or snow" makes the condition "defective and unsafe" within the meaning of the two-year statute of limitations. Griebel v. Andersen Corp., 489 N.W.2d 521, 523 (Minn. 1992). A condition is "unsafe," even if it is not dangerous, if "the defect simply renders the property insecure and vulnerable to invasion," such as "[a] window or door which fails to provide the expected barrier against unwanted elements such as rain or snow." Id. Subsequent cases have held that windows, a roof, and even siding that do not provide a barrier against the elements are the types of defects that are subject to the two-year statute of limitations. See Oreck v. Harvey Homes, Inc., 602 N.W.2d 424, 428

111

(Minn. Ct. App. 1999) (holding that § 541.051 applied to claims that a house was

defective because "[t]he windows, roof, and sockets were not providing a barrier

against the unwanted elements of wind, rain, and ice"); Metro. Life Ins. Co. v.

M.A. Mortenson Cos., Inc., 545 N.W.2d 394, 400 (Minn. Ct. App. 1996) (holding

that § 541.051 applied to claims that windows were defective in that sunlight

penetrated opaque windows and illuminated structural materials); Donatelle

Plastics Inc. v. Stonhard, Inc., No. CIV.01-1429 (RHK/AJB), 2002 WL 31002847, at

*12 (D. Minn. Sept. 5, 2002) (holding that § 541.051 applied to claims that flooring

was defective in that it failed to adhere to a cement substrate, delaminated,

discolored, peeled, and cracked); Heimer v. Larson Siding, Inc., No. C9-99-902,

1999 WL 1011973, at *1 (Minn. Ct. App. Nov. 9, 1999) (holding that § 541.051

applied to claim that a contractor installed defective siding that was "loose and

buckling").

    Bowers clearly alleges that Hardieplank has left his home insecure and

vulnerable to invasion by the elements. His original Complaint alleges: "Plaintiff

purchased and installed an exterior siding product that is defective and unsafe. .

. . The defect causes damage to Plaintiff's home, in addition to damage to the

siding itself, by allowing moisture to enter through or around the Siding."

(Second Frakes Decl., Ex. E, Bowers Compl. ¶124.)  The current operative

complaint, the ACC, asserts that the siding "is susceptible to premature failure,

causing damage to the underlying structures and property of Plaintiff by

allowing water and moisture to penetrate into the structure."  (ACC ¶ 6.  See also

id. ¶¶ 34 (siding "allows water and moisture to penetrate into the structure,

thereby causing damage to the underlying structure and other adjoining

property"), 123 ("Due to gaps and deterioration in the Siding, the underlayment

of Plaintiffs' home was exposed to the elements, risking further damage to the

underlying structure.").)  Also, Plaintiffs' expert opines that gaps in the siding,

like those alleged by Bowers, can permit "additional moisture intrusion" and

"exposure to ultraviolet radiation, which affects any underlayment or building

paper."  (Exponent Report at 65.)  All of Bowers' claims seek "to recover

damages for any injury to property . . . arising out of the defective and unsafe

condition of an improvement to real property."  Minn. Stat. § 541.051, subd.1.

Additionally, all of Bowers' causes of action are the type of claims that are

subject to the two-year statute of limitations.  The two-year statute of limitations

applies to "actions based on breach of an express written warranty."  Minn. Stat.

§ 541.051, subds. 1, 4.  Therefore, it applies to Count 1: Breach of Express

Warranty. Additionally, because the statute applies to actions "in contract, tort, or otherwise," it further applies to Count 7: Minnesota Unlawful Trade Practices Act and Count 8: False Statements in Advertising Act claims. See, e.g., Donatelle Plastics Inc., 2002 WL 31002847, at *12 (applying two-year statute of limitations to claims, including statutory consumer fraud and false advertising claims, that flooring was defective in that it failed to adhere to a cement substrate). Thus, the two-year statute of limitations applies to all of Bowers' Minnesota claims.

### 2. Accrual

In 2007, Bowers personally observed shrinkage and disintegration of his siding. He saw the disintegration as a problem, believed that the siding had "failed in some way to be the product that I thought I had bought," and was so concerned that he called Hardie and also talked to a roofing contractor about his issues and to find out about replacing the siding. Bowers knew that a problem existed with his siding in 2007. He also knew, in 2007, that Hardie refused his request to send someone to inspect his house and denied that his siding shrank. Bowers had no contact with Hardie after 2007, and there is no evidence that he ever submitted a warranty claim to Hardie. Thus, Bowers' claims accrued in 2007, when he first discovered his "injury," Minn. Stat. § 541.051, subd.1 (non-

express warranty claims) and when he also discovered Hardie's alleged

"breach," id., subd. 4.

### 3.   Equitable Estoppel or Tolling

Bowers argues that his claims should be equitably tolled because a Hardie

representative told Bowers that Hardieplank does not shrink and refused to send

anyone to look at Bowers' house.

> [W]hen the defendant makes assurances or representations that the
> injury will be repaired and the plaintiff reasonably relies on these
> assurances to their detriment, the defendant may be estopped from
> asserting a statute of limitations defense.
>
> Estoppel depends on the facts of each case and ordinarily presents a
> question for the jury.  But, when only one inference can be drawn
> from the facts, the question is one of law.

Oreck, 602 N.W.2d at 428 (citations omitted).

Equitable tolling does not apply.  Equitable tolling can occur when a

defendant lulls a plaintiff into not filing suit until after the limitations period has

run, for example, by promising to make the repairs.  Here, the opposite situation

is alleged.  Bowers claims that, when he contacted Hardie in 2007, Hardie

immediately denied liability and responsibility and made no offers to repair the

problems.  See, e.g., Oreck, 602 N.W.2d at 429 (upholding grant of summary

judgment on statute of limitations because equitable tolling could not apply

when the defendant "consistently denied any responsibility for the air and water leakage and made no promises to repair the problems").  In contrast, the Minnesota Supreme Court has found estoppel precisely when the defendant "failed to deny liability and [] defendant stated that it was conducting an investigation that might lead to settlement."  Brenner v. Nordby, 306 N.W.2d 126, 127 (Minn. 1981).

Bowers alleges that he had no more contact with Hardie after it denied responsibility in 2007.  Thus, in 2007, Hardie put him on notice that it would not fix his siding issues.  Also, because he had no contact with Hardie after 2007, Hardie could not have made any representation or inducement upon which he relied to his detriment.

> A statute of limitations may be tolled if the cause of action is fraudulently concealed by the defendant.  To establish fraudulent concealment, a plaintiff must prove there was an affirmative act or statement which concealed a potential cause of action, that the statement was known to be false or was made in reckless disregard of its truth or falsity, and that the concealment could not have been discovered by reasonable diligence.

Haberle v. Buchwald, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992) (citations omitted).  "Merely establishing that a defendant had intentionally concealed the alleged defects is insufficient; the claimant must establish that it was actually

unaware that the defect existed before a finding of fraudulent concealment can be sustained." Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 919 (Minn. 1990). "The burden is on the plaintiff to establish the elements of fraudulent concealment." Lamere v. St. Jude Med., Inc., 827 N.W.2d 782, 788 (Minn. Ct. App. 2013).

Because Bowers knew of his alleged injury by 2007, and since Hardie made no representations to Bowers other than to deny responsibility for the problems, the fraudulent concealment doctrine cannot apply. Thus, neither equitable estoppel nor tolling applies.

Bowers' Minnesota claims accrued in 2007. No tolling applies. Thus, the statute of limitations expired in 2009, yet Bowers failed to file suit until 2012. His Minnesota claims are barred by the statute of limitations.

### E.    Count 5: California UCL

Assuming without deciding that the UCL applies to Bowers' allegations, the Court holds that any UCL claim is barred by the statute of limitations.

Minnesota Statute § 541.31, subdivision 1(a), provides that, with certain exceptions, "if a claim is substantively based [] upon the law of one other state, the limitation period of that state applies." Bowers concludes that, because his UCL claim is based on the law of California, California's four-year statute of

limitations applies, with accrual governed by the discovery rule. Cal. Bus. &

Prof. Code § 17208; <u>Aryeh v. Canon Bus. Solutions, Inc.</u>, 292 P.3d 871, 878 (Cal.

2013). "[T]he discovery rule, where applicable, postpones accrual of a cause of

action until the plaintiff discovers, or has reason to discover, the cause of action."

<u>Aryeh</u>, 292 P.3d at 875 (citations omitted). Hardie argues that Minnesota's two-

year statute of limitations applies under the exception provided in Minnesota

Statute § 541.33.

 The Court need not decide which statute of limitations applies because,

even if the Court were to apply the longer four-year limitations period found in

the UCL, Bowers' claim is time barred.

> Under the discovery rule, which delays accrual of a cause of action
> until a party discovers or has reason to discover the cause of action,
> if the party has notice of facts that would put a reasonable person on
> inquiry, or has the reasonable opportunity to obtain information
> from sources open to investigation, the limitations period begins to
> run.

<u>Fuller v. First Franklin Fin. Corp.</u>, 163 Cal. Rptr. 3d 44, 50 (Cal. Ct. App. 2013)

(citations omitted).

> [T]he limitations period begins once the plaintiff has notice or
> information of circumstances to put a reasonable person <u>on inquiry</u>
> . . . A plaintiff need not be aware of the specific "facts" necessary to
> establish the claim; that is a process contemplated by pretrial
> discovery. Once the plaintiff has a suspicion of wrongdoing, and

118

therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

Jolly v. Eli Lilly & Co., 751 P.2d 923, 927-28 (Cal. 1988) (citations omitted).

As explained with respect to the Minnesota claim, in 2007, Bowers was actually aware of the alleged problems with his siding; he believed that the siding had "failed in some way to be the product that I thought I had bought," and he was aware that Hardie had rebuffed his attempt to obtain his requested relief from Hardie. His UCL claim accrued at that time. As previously explained, there exists no basis for tolling. Thus, because Bowers failed to bring the claim by 2011, it is barred by the statute of limitations.

### F.    Count 4: Declaratory and Injunctive Relief

Because Hardie is entitled to summary judgment on all of Bowers' substantive claims, it is entitled to summary judgment on the request for declaratory and injunctive relief.

### XII.    (HERNANDEZ: COLORADO) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 341]

### A.    Facts Related to Plaintiff John Hernandez

Plaintiff John Hernandez is a Colorado resident. In 2006, Hernandez hired Backwoods Builders to construct a house and cistern shed on his property in

Dolores, Colorado.  ([Docket No. 345] Frakes Hernandez Decl., Ex. A, Hernandez

Answer to Interrogatory No. 2; Frakes Hernandez Decl., Ex. B, Hernandez Dep.

23, 25.)  On October 20, 2006, Backwoods Builders purchased Hardieplank siding

from a lumberyard called ProBuild, formerly known as UBC Builders.

(Hernandez Answer to Interrogatory No. 2; Hernandez Dep. 28-31.)  Hernandez

paid Backwoods Builders to construct the house, but did not pay ProBuild or

Hardie for the siding.  (Hernandez Dep. 30-32.)  He does not know how much

Backwoods Builders paid to purchase the siding or for the siding to be

prefinished with a stain.  (Id. 32-33.)

Before Backwoods Builders bought the Hardieplank for Hernandez's

house, Hernandez spoke with UBC Builders employee Jeff Greve.  (Hernandez

Dep. 38.)  Hernandez understood that Greve worked for UBC Builders and that

UBC Builders was a separate company than Hardie.  (Id. 44.)  Hernandez told

Greve that he was "looking for a low-maintenance product, something with fire

protection, because of the area [he] live[s] in, as well as something that was going

to withstand the elements of where [he] was."  (Hernandez Dep. 43.)  Greve

responded by pointing to the Hardieplank and saying that was the product he

wanted.  (Id.)  Greve also told Hernandez that the Hardieplank had a "significant

warranty," although Hernandez can no longer recall the particular length of the warranty. (Id. 44.) Hernandez "selected Hardieplank because of its durability, its warranty, and its fire protection." (Id. 39.)

Before the siding was purchased, Hernandez never spoke with anyone employed by Hardie, never visited Hardie's web site, never reviewed any Hardie brochure or advertisement, never saw a Hardie television commercial, and never heard a Hardie radio advertisement. (Hernandez Dep. 37-38.) He did see a display of different colored siding pieces at the lumberyard, but the display had no writing on it. (Id. 41-42, 45-46.)

The siding that was purchased for Hernandez's house was prefinished with Mason's Select "Cedar" stain. (Hernandez Dep. 35; Frakes Decl., Ex. C.) Hardie has never applied or sold its siding with Mason's Select stain. (Klein Decl. ¶ 6.) Thus, after Hardie sold either primed or unprimed siding to its customer, the stain was applied by a third party unaffiliated with Hardie. (Id.) Hardie's best practices recommend that semi-transparent stains, such as Mason's Select "Cedar" stain, should not be used. (Klein Decl. ¶ 3; Klein Decl., Ex. 1, 2005 Hardie Installation Best Practices for Exterior Siding and Trim Products, at 23.) A Hardie technical bulletin available since 1997 states that "[c]lear coats and

semi-transparent stains have not proven durable in exterior exposures.  James

Hardie does not recommend their use on Hardie Siding Products."  (Klein Decl.

¶ 4; Klein Decl., Ex. 2, 1997 Hardie Technical Bulletin No. S-100.)  A Hardie

technical bulletin available since 2003 states that "Hardie does not warrant the

appearance or durability of semitransparent stains or clear coats."  (Klein Decl. ¶

5; Klein Decl., Ex. 3, 2003 1997 Hardie Technical Bulletin No. S-100.)

In 2010, Hernandez noticed "fading" and "flaking" on his siding.

(Hernandez Dep. 52-53, 57-58; Frakes Hernandez Decl., Ex. A, Hernandez

Answer to Interrogatory No. 5.)  By "flaking," Hernandez meant that the stain

was coming off and, by "fading," he meant that the color of the siding was

"becoming lighter."  (Hernandez Dep. 52, 58.)  He thought that the fading and

flaking was a "problem" and that there was something wrong with the siding on

all four sides of the house.  (Id. 59; Second Frakes Hernandez Decl., Ex. H,

Hernandez Dep. 54.)  He discussed these problems with his wife.  (Frakes

Hernandez Decl., Ex. B, Hernandez Dep. 53, 59.)  In 2010, Hernandez's wife

attempted to repair the issues with touch up paint.  (Hernandez Dep. 53.)

Hernandez submitted a warranty claim to Hardie in November 2013.

(Hernandez Dep. 78-79; Frakes Hernandez Decl., Ex. D, Hernandez Warranty

Claim.)  The only "concern" he identified on the warranty claim was that the coating on the siding seemed to be flaking off.  (Hernandez Warranty Claim; Hernandez Dep. 79-80.)

On December 19, 2013, a Hardie inspector inspected the siding on Hernandez's home.  (Hernandez Dep. 83.)  The inspector orally told Hernandez that he could not patch the problems because then Hernandez would have to paint the entire house to match the touch ups.  (Boyle Decl., Ex. 1, Hernandez Dep. 86-87.)

On February 5, 2014, Hardie emailed Hernandez and denied responsibility for the problem:

> At the moment I am researching the company that stained you[r] product so I can assist in getting some resolution to you[r] peeling issue. . . .  The issues you are having are a pre-finish, not a JH issue. There are very few things I can do to help you so I am looking into other avenues you can move towards for resolution.

(Boyle Decl., Ex. 2; Frakes Hernandez Decl., Ex. B, Hernandez Dep. 99.)

On February 25, 2014, Hardie emailed Hernandez a settlement agreement. (Boyle Decl., Ex. 3.)  It offered to pay $3,100 to a contractor of Hernandez's choosing to paint 3,100 square feet of the siding, and to pay to caulk the siding and dispose of any debris.  (Frakes Hernandez Decl., Ex. B, Hernandez Dep. 100-

01.)  The total square feet of all siding on Hernandez's house was 2,618 square feet.  (Hernandez Dep. 102.)  Hernandez understood that, on February 5, 2014, Hardie was not accepting his warranty claim and that on February 25, 2014, Hardie was offering to pay money to resolve the claim although Hardie did not believe his issues were covered by the warranty.  (Id. 99.)

On October 9, 2014, Hernandez filed suit against Hardie in the District of Colorado.  (Civil File No. 14-4655)

### B.    Choice of Law

Under Colorado's "most significant relationship to the occurrence and parties test," AE, Inc. v. Goodyear Tire & Rubber Co., 168 P.3d 507, 508 (Colo. 2007), the Court applies Colorado law because Hernandez filed his lawsuit in Colorado; he is a Colorado resident; his home, on which the siding was installed, is located in Colorado; and he brought a statutory claim under Colorado law.

### C.    Summary of the Motion

After the Court's previous ruling on the motion to dismiss, the following claims remain: Count 1: Violation of the Colorado Consumer Protection Act; Count 3: Breach of Express Warranty; Count 4: Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose; Count 5: Failure of

124

Essential Purpose; and Count 8: Declaratory and Injunctive Relief.  Hardie moves

for summary judgment on all claims.

### D.  Count 1: Colorado Consumer Protection Act

In Count 1, Hernandez asserts a claim under the Colorado Consumer

Protection Act, Colo. Rev. Stat. § 6-1-105, et seq. ("CCPA").  To prove a private

claim for relief under the CCPA, a plaintiff must show:

> (1) that the defendant engaged in an unfair or deceptive trade
> practice; (2) that the challenged practice occurred in the course of
> defendant's business, vocation, or occupation; (3) that it significantly
> impacts the public as actual or potential consumers of the
> defendant's goods, services, or property; (4) that the plaintiff
> suffered injury in fact to a legally protected interest; and (5) that the
> challenged practice caused the plaintiff's injury.

Crowe v. Tull, 126 P.3d 196, 201 (Colo. 2006) (citation omitted).

Hernandez's CCPA claim fails because Hardie never made any

representations to Hernandez.  Because Hernandez never heard or saw any

representation by Hardie, he could not have relied on any such statements.

"Without alleging that he heard or had access to [the defendant's] affirmative

statements, or identifying the specific statements on which he allegedly relied,

Colorado Plaintiff cannot demonstrate proximate cause under the CCPA."  In re

Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 833 (S.D. Ohio 2012).

Under the CCPA, a defendant's misrepresentations to third parties can be actionable, so long as those misrepresentations caused the plaintiff's injury. See Hall v. Walter, 969 P.2d 224, 235 (Colo. 1998); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 224 (S.D.N.Y. 2012). Here, Hernandez asserts that an unaffiliated lumberyard employee made two alleged misrepresentations to him: that Hardieplank was covered by a 50-year warranty and that Hardieplank is low maintenance. However, Hernandez fails to present any evidence that Hardie made a misrepresentation to that lumberyard employee.

Even if Hernandez could show that Hardie had told the lumberyard employee that Hardieplank was covered by a 50-year warranty, no CCPA claim would survive. There is no dispute that the siding did come with a 50-year transferrable warranty. There is no evidence that Hardie did not intend to honor the warranty at that time, and, in fact, it offered to repaint all of Hernandez's house even though the Limited Warranty excludes coverage for design defects and for third-party coatings. See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142, 148 (Colo. 2003) ("A promise cannot constitute a misrepresentation unless the promisor did not intend to honor it at the time it

was made.")  As the Court has previously explained with respect to Plaintiff Kavianpour, there is no support for a signal theory of interpreting the promise of providing a warranty as a signal of the siding's useful life.  See also Koch v. Kaz USA, Inc.  No. 09-CV-02976-LTB-BNB, 2011 WL 2610198, at *5 (D. Colo. July 1, 2011) (holding that "the '5 Year Limited Warranty' statement on the HZ–690 packaging does not constitute an unfair or deceptive trade practice as a matter of law," because such a statement does not constitute a promise that "the heater would operate normally for 5 years," when "the language of the warranty itself [] states that it 'applies to repair or replacement of product found to be defective in material or workmanship.'"); Boyd v. A.O. Smith Harvestore Prod., Inc., 776 P.2d 1125, 1128 (Colo. App. 1989) ("A repair or replace warranty does not warrant the product's performance in the future.  Rather, it provides that if a product fails or becomes defective, the seller or manufacturer will repair or replace within a stated period.").  In fact, Hernandez admitted in his deposition that the "life of the warranty is different than the life of the product" and that "the warranty period and the expected life of the product can be two different things."  (Frakes Hernandez Decl., Ex. B, Hernandez Dep. 137.)

Even if Hernandez could show that Hardie had told the lumberyard

employee that Hardieplank was low maintenance, no CCPA claim would

survive.  The statement that the siding is low maintenance is inactionable

puffery.  See Park Rise Homeowners Ass'n, Inc. v. Resource Constr. Co., 155 P.3d

427, 435 (Colo. App. 2006) ("[T]he CCPA does not, as a matter of law, make

actionable a statement which would otherwise be mere puffery.").  See also

Peruto v. TimberTech Ltd., 126 F. Supp. 3d 447, 458 n.10 (D.N.J. 2015) (holding

that the statement "designed to provide years of low-maintenance use and

enjoyment" was "puffery as a matter of law") (applying New Jersey law).

### E.    Count 3: Breach of Express Warranty

#### 1.    Informal Express Warranty

Under Colorado law, "[a]ny affirmation of fact or promise made by the

seller to the buyer which relates to the goods and becomes part of the basis of the

bargain creates an express warranty that the goods shall conform to the

affirmation or promise."  Colo. Rev. Stat. § 4-2-313(1)(a).  Statements made in

advertising or technical manuals can create express warranties.  See Westric

Battery Co. v. Standard Elec. Co., 482 F.2d 1307, 1314 (10th Cir. 1973).  Hernandez

bases his breach of the informal express warranty claim on the allegation Greve

told him that Hardieplank was a low-maintenance product covered by a 50-year warranty.

No informal express warranty claim can survive because there is no evidence that Hardie made any representations to Hernandez. The Colorado UCC provides that an affirmation of fact or promise "made by the seller to the buyer" under certain circumstances "creates an express warranty." Colo. Rev. Stat. § 4-2-313. Hernandez received no representations from Hardie before the siding was purchased. Hernandez understood that Greve worked for UBC Builders and that UBC Builders was a separate company that Hardie. Thus, Hardie is not bound by Greve's statements that Hardie had a significant or 50-year warranty, which was a true statement, or that it was low maintenance, which is inactionable puffery. Because Hardie made no actionable affirmations to Hernandez, his informal express warranty claim fails.

Moreover, the claim is barred by Colorado's three-year statute of limitations. Actions for breach of warranty under the Colorado UCC must be commenced within three years. Colo. Rev. Stat. §§ 4-2-725(1), 13-80-101(1). The claim accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Id. § 4-2-725(2). A breach of warranty "occurs

129

when tender of delivery is made," except in cases "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance," in which case the claim accrues when the "breach is or should have been discovered." Id. The siding was purchased on October 20, 2006, but Hernandez did not file suit until October 2014.

The Court holds that the future performance exception does not apply and, thus, the statute of limitations bars Hernandez's informal warranty claim. The representation that Hardieplank came with a significant or 50-year warranty is not an explicit promise that the siding will perform for 50 years. Rather, it is a true statement about the duration of the product warranty offered with the siding. See Boyd, 776 P.2d at 1128 (holding that warranty of future performance must explicitly extend to future performance of the goods and "must expressly provide a guarantee that the product will perform as promised in the future;" thus a repair and replace warranty is not a warranty of future performance).

There is no evidence that anyone ever told Hernandez that Hardieplank offered a lifetime of low maintenance. Hardie served an interrogatory on him asking him to identify "each express warranty that you allege was breached." (Frakes Hernandez Decl., Ex. A, Hernandez Answer to Interrogatory No. 11.)

130

Hernandez responded that the lumberyard employee stated that the siding was "low maintenance," not a "lifetime of low maintenance." (Id.)  A statement that Hardieplank is low maintenance is not a warranty of future performance.  See, e.g., Haley v. Kolbe & Kolbe Millwork Co., No. 14-CV-99-BBC, 2015 WL 3774496, at *14-15 (W.D. Wis. June 16, 2015) (holding that "statements in defendant's brochures that the windows were 'low maintenance,' 'durable' and 'rot free'" were not warranties of future performance) (applying Wisconsin law), aff'd 863 F.3d 600 (8th Cir. 2017); Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280, 291 (3d Cir. 1980) (holding that statements that roofing product required "minimum maintenance and repair costs" were not warranties of future performance) (applying Illinois law).

### 2.    Formal Express Warranty

For the reasons discussed with regard to Plaintiff Swiencki, the Court holds that the Limited Warranty does not provide coverage for design defects. Because Hernandez's entire action is based on the claim that Hardieplank is intrinsically flawed due to a design defect, Hardie is entitled to summary judgment on Hernandez's breach of the formal express warranty claim.

### F.    Count 4: Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose

Hernandez's breach of implied warranties claim is barred by the three-year statute of limitations.  A breach of warranty claim accrues upon tender of delivery unless the warranty "explicitly extends to future performance of the goods."  Colo. Rev. Stat. § 4-2-725(2).  "By simple definition . . ., an implied warranty cannot 'explicitly' extend to future performance."  Carabello v. Crown Controls Corp., 659 F. Supp. 839, 842 (D. Colo. 1987).  See also Grand Island Express v. Timpte Indus., Inc., No. 4:CV91-3624, 1993 WL 726235, at *5 (D. Neb. Oct. 29, 1993) ("The discovery rule of Section 2–725 does not apply to implied warranties.") (applying both Nebraska and Colorado law), aff'd, 28 F.3d 73 (8th Cir. 1994).  Thus, Hernandez's breach of implied warranties claim accrued upon tender of delivery in October 2006 and expired in 2009.  He did not bring suit until 2014.  Count 4 is dismissed as untimely.

### G.   Count 5: Failure of Essential Purpose

The Colorado UCC provides that a warranty may modify or limit remedies available for defective goods, except that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title."  Colo. Rev. Stat. § 4-2-719(2).  "A remedy fails of its essential purpose if it operates to deprive a party of the substantial value of the

132

contract." Cooley v. Big Horn Harvestore Sys., Inc., 813 P.2d 736, 744–45 (Colo. 1991).

> To establish their claim of failure of essential purpose of the remedy of suit for breach of a warranty to repair or replace any defective product or parts thereof, the plaintiffs were required to establish that the product was defective in material or workmanship, that the defendants had an opportunity to repair or replace the defects, that they were unable to do so, that their inability to effectively repair or replace substantially affected the value of the product and that the impairment of the value damaged the plaintiffs.

Id. at 744 n.7.

The first element of a claim for failure of essential purpose is that there was a breach of warranty. As the Court has held, the Limited Warranty did not provide coverage for a design defect, which is the only type of defect asserted by Hernandez. The Court has further held that Hardie is entitled to summary judgment on Hernandez's claim for breach of informal warranties. Thus, Hernandez cannot sustain a claim for failure of essential purpose based on the Limited Warranty or on the informal warranties.

## H.    Count 8: Declaratory and Injunctive Relief

Because Hardie is entitled to summary judgment on all substantive counts, it is also entitled to summary judgment on the request for declaratory and injunctive relief.

133

## XIII.   (ANGELICI: WISCONSIN) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 346]

### A.      Facts Related to Plaintiffs David and Sharon Angelici

Plaintiffs David and Sharon Angelici are Wisconsin residents who own a house located in Burlington, Wisconsin.  ([Docket No. 349] Frakes Angelici Decl., Ex. A, Angelicis' Answer to Interrogatory No. 2.)  In November 2002, they installed Hardieplank siding on their home.  (Id.; Polakoff Decl., Ex. 1, D. Angelici Dep. 11-12, 14.)  The siding was prefinished with Cabot-brand stain by Cedar Siding & Lumber, Inc., which provided that service to Burlington Lumber. (Frakes Decl., Ex. A, Angelicis' Answer to Interrogatory No. 3; Frakes Angelici Decl., Ex. B, D. Angelici Dep. 19-20; Frakes Angelici Decl., Ex. C, S. Angelici Dep. 19-21.)

Before the Angelicis purchased the Hardieplank, David Angelici visited Burlington Lumber several times and discussed siding with a Burlington Lumber employee.  He saw siding samples and a siding display, but he cannot recall any writing on either.  (D. Angelici Dep. 30-32.)  He reviewed an 11 inch by 17 inch brochure and a smaller version of that brochure, but cannot recall anything that they said.  (Id. 32, 35-36.)  David Angelici had multiple conversations with Burlington Lumber employee Chris Impens.  (Id. 22-25.)  He understood that

Impens was employed by Burlington Lumber and not Hardie and that

Burlington Lumber and Hardie were two separate companies.  (Id. 22-23.)

Impens told him that Hardieplank was a maintenance-free product covered by a

50-year warranty.  (D. Angelici Dep. 23-24; Angelicis' Answer to Interrogatory

No. 1.)  David Angelici believed that Hardieplank "would outlast the use that I

had for it" and would not suffer any defects.  (Polakoff Decl., Ex. 1, D. Angelici

Dep. 105.)

Before the Angelicis installed the Hardieplank, David Angelici reviewed

the Limited Warranty and then decided to have the siding installed after

reviewing the warranty.  (Frakes Angelici Decl., Ex. B, D. Angelici Dep. 26-27.)

He skimmed it and noticed that there were "conditions" and "exclusions" to the

warranty coverage.  (Id. 27-28.)

Sharon Angelici did not select the Hardieplank siding.  (Frakes Angelici

Decl., Ex. C, S. Angelici Dep. 23.)  Once the siding was selected, she chose the

color.  (Id. 24, 26.)

The Angelicis have no recollection of any information received, before they

purchased the Hardieplank, from a Hardie employee, Hardie's website, Hardie

television commercials, or Hardie radio advertisements.  (D. Angelici Dep. 36-38; S. Angelici Dep. 27.)

In 2006, Sharon Angelici first noticed problems with the Hardieplank.  (S. Angelici Dep. 28-29.)  She noticed "discoloration and chipping" and was "concerned about it looking like drywall where it was going to start to crumble. And then my husband and I just started looking into why it would be doing that."  (Id.)  Also in 2006, David Angelici observed the siding fading to pink, so he talked to Impens about the issue.  (D. Angelici Dep. 38-40.)  David Angelici "definitely" thought that there was a problem with the siding at that time.  (Id. 40.)

In October 2008, at Burlington Lumber's request, Impens and a Hardie representative visited the Angelicis' house.  (D. Angelici Dep. 38-40, 42-43.) David Angelici did not meet or have a conversation with that Hardie representative, whose name he does not remember.  (Id. 42-44.)  Impens told David Angelici that the Hardie representative stated that Hardie was not at fault for any of the problems with the Hardieplank – flaking, warping, separating, and fading – and that the fading was ordinary "weathering."  (D. Angelici Dep. 42-44; Angelicis' Answer to Interrogatory No. 6.)

In 2008 and 2009, the Angelicis noticed gapping and shrinking in the siding.  (Polakoff Decl., Ex. 3, S. Angelici Dep. 36; Angelicis' Answer to Interrogatory No. 5.)

On May 31, 2010, the Angelicis submitted a Warranty Claim Information Form to Hardie making a claim under the Limited Warranty.  (Frakes Angelici Decl., Ex. E, Angelici Warranty Claim; Frakes Angelici Decl., Ex. B, D. Angelici Dep. 65.)  The claim stated: "The siding is beginning to deteriorate.  The color has changed from brown to pink.  The caulk is drying and splitting and there is shrinking."  This was the only warranty claim that the Angelicis ever made to Hardie.  (D. Angelici Dep. 65.)

In July 2010, Hardie sent an inspector to the Angelicis' home.  (Polakoff Decl., Ex. 1, D. Angelici Dep. 66.)  On August 13, 2010, Hardie emailed the Angelicis and offered to replace 600 square feet of Hardieplank siding on the Angelicis' home.  (Polakoff Decl., Ex. 5 at 32; D. Angelici Dep. 58-59.)  The Angelicis declined Hardie's offer to repair because they thought that it was inadequate, that 1,000 square feet of siding were affected, and that the offer would be a piecemeal repair with nonmatching siding.  (D. Angelici Dep. 58-59, 69-72; Frakes Angelici Decl., Ex. C, S. Angelici Dep. 73-74.)

The Angelicis received quotes that it would cost between $19,000 and $34,000 to replace all of their Hardieplank siding.  (Polakoff Decl., Exs. 6-7.)  In June 2014, they repainted their Hardieplank at a cost of $4,300 in order to protect their home from the elements and to prevent the Hardieplank from deteriorating further.  (Polakoff Decl., Ex. 3, S. Angelici Dep. 80; Polakoff Decl., Ex. 8.)

In January 2015, the Angelicis substituted for previous Plaintiff Steven Schindler, who had filed claims against Hardie in the Eastern District of Wisconsin on January 6, 2014.  (Civil File No. 14-285)

### B.    Choice of Law

This lawsuit was originally filed in the Eastern District of Wisconsin by Plaintiff Schindler.  The case was transferred to this Court by the JPML.  Then, in January 2015, the Angelicis were substituted for Schindler as Plaintiffs.

"The first rule in Wisconsin choice of law rules is that the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of greater significance."  State Farm Mut. Auto. Ins. Co. v. Gilette, 641 N.W.2d 662, 676 (Wis. 2002) (citation and footnote omitted).  This lawsuit was originally filed in Wisconsin, the Angelicis are Wisconsin residents and their home, on which the siding was installed, is located in Wisconsin, and any injury occurred in Wisconsin.  The Court concludes that Wisconsin law applies.

138

### C.      Summary of the Motion

The Angelicis assert three claims against Hardie: Count 1: Breach of Express Warranty; Count 2: Unjust Enrichment; and Count 3: Declaratory and Injunctive Relief.

### D.      Count 1: Breach of Express Warranty

#### 1.      Informal Express Warranty

Under Wisconsin's UCC, a claim for breach of warranty must be brought within six years of its accrual.  Wis. Stat. § 402.725(1); Selzer v. Brunsell Bros. Ltd., 652 N.W.2d 806, 812 (Wis. Ct. App. 2002).  A claim accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  Wis. Stat. § 402.725(2).  The "breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  Id.

As this Court held in the Schindler Order, the future performance exception only applies when the warranty "explicitly extends to future performance," i.e., when "a warranty guarantees a product for a particular number of years, or for a less precise, but still determinable period of time."

139

Selzer, 652 N.W.2d at 813 (citations omitted).  "[V]ague statements concerning product longevity do not comply with the requirement of a 'specific reference to a future time' that would create a warranty of future performance within the meaning of Wis. Stat. § 402.725(2)."  Id. at 813 (citations omitted).  "[A] future performance warranty must be clear, definite, precise, and unmistakable," and any "ambiguity in warranty language should be interpreted against the existence of a future performance warranty."  Midland Builders, Inc. v. Semling-Menke Co., 703 N.W.2d 383, 2005 WL 1639307, at *13-14 (Wis. Ct. App. 2005) (unpublished) (citing Selzer, 652 N.W.2d at 806).

Here, Plaintiffs claim that Impens told David Angelici that Hardieplank was a maintenance-free product covered by a 50-year warranty.  Neither of these representations are warranties of future performance.  Neither statement guarantees that the siding will last for a particular number of years or for a determinable period of time.  The Angelicis do not allege that Hardie's products did not come with a 50-year warranty, so there is no allegation that Hardie breached that promise.  An advertisement's reference to a formal limited warranty does not, on its own, create a new informal promise that the product will last for a certain amount of time without any of the terms or conditions of

the limited warranty. Thus, none of the informal warranties explicitly extended to future performance, so the future performance exception does not apply and the claim began to accrue at tender of delivery in 2002. See In re Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2014 WL 2987657, at *3–4 (D. Minn. June 30, 2014).

Although a promise to repair problems with the siding before the six-year statute of limitations expired might support equitable estoppel, see In re Hardieplank Fiber Cement Siding Litig., 2014 WL 2987657, at *4; here, no such promise was made until 2010. (See D. Angelici Dep. 70; S. Angelici Dep. 78 (testifying that offer to repair was made in 2010)). Thus, the breach of informal express warranty claim accrued in 2002 and expired in 2008. The claim is time-barred.

The Court further notes that, even if the claim was not time-barred, Hardie would be entitled to summary judgment. There is no evidence that it breached the warranty that the siding came with a 50-year warranty, because, in fact, David Angelici admits that the siding did come with a 50-year warranty. Moreover, Burlington Lumber's statement that the siding was "maintenance free" is not actionable against Hardie because the statement was made by a third

party, unaffiliated with Hardie.  See Wis. Stat. § 402.313(1)(a) (providing that an

express warranty is created by an affirmation "made by the seller to the buyer");

Shoemaker v. Hearst Corp., 632 N.W.2d 125, 2001 WL 694715, at *2 (Wis. Ct.

App. 2001) (unpublished) ("Wisconsin law requires privity of contract between

the parties before liability can be founded on breach of express warranty.")

(citations omitted).  The Angelicis have no evidence that Hardie ever represented

to them that the siding was "maintenance free."

### 2.    Formal Express Warranty

For the reasons explained with respect to Plaintiff Swiencki, the Limited

Warranty does not cover design defects.  See also Barden v. Hurd Millwork Co.,

No. CASE NO. 06C046, 2009 WL 3740619, at *1-2 (E.D. Wis. Nov. 5, 2009)

(providing that, "even if dissipation were the result of a defect, the defect would

be one of design rather than workmanship or materials and therefore not within

the warranty [that warranted the windows.") (citing Voelker v. Porsche Cars N.

Am., 353 F.3d 516, 527 (7th Cir. 2003)).  Therefore, Hardie is entitled to summary

judgment on the Angelicis' breach of the formal express warranty claim.

Moreover, because the Angelicis discovered the problems with their siding in

2006 and did not bring suit until 2015, even if the limitations period were tolled

from October 2008 through 2010 as requested by Plaintiffs, the statute of

limitations expired before the Angelicis brought the current lawsuit.

### E.    Count 2: Unjust Enrichment

The Angelicis' unjust enrichment claim is time-barred.  Unjust enrichment

is subject to a six-year statute of limitations, the discovery rule does not apply,

and the claim accrues upon breach regardless of whether the claimant knows of

the breach.  See Boldt v. State, 305 N.W.2d 133, 141 (Wis. 1981); Stanczyk v.

Prudential Ins. Co. of Am., No. 15-CV-0097-CJW, 2017 WL 1632874, at *10-11

(N.D. Iowa Apr. 28, 2017); Servicios Especiales Al Comercio Exterior v. Johnson

Controls, Inc., No. 08-CV-1117, 2011 WL 1304922, at *2-3 (E.D. Wis. Apr. 1, 2011).

Here, a benefit was conferred on Hardie when the Angelicis purchased the

siding and Hardie retained the benefit of that payment.  Thus, the allegedly

improper benefit and wrongful act occurred in 2002 when Hardie took Plaintiffs'

money and provided allegedly defective siding.  The statute of limitations

expired in 2008.  Moreover, the unjust enrichment claim is barred because an

enforceable contract exists between the parties – the Limited Warranty.  See, e.g.,

Cont'l Cas. Co. v. Wis. Patients Comp. Fund, 473 N.W.2d 584, 587 (Wis. Ct. App.

1991) ("The doctrine of unjust enrichment does not apply where the parties have

entered into a contract.").  Hardie is entitled to summary judgment on Count 2.

F.    **Count 3: Declaratory and Injunctive Relief**

Because Hardie is entitled to summary judgment on the Angelicis'

substantive claims, it is also entitled to summary judgment on Count 3.

## XIV.   (PICHT: MINNESOTA) DEFENDANT'S COMBINED MOTION FOR SUMMARY JUDGMENT AND TO DISMISS UNDER RULE 9(B) [CIVIL FILE NO. 11-958 DOCKET NO. 25]

A.    **Facts Related to Plaintiff Heidi Picht**

Plaintiff Heidi Picht is a Minnesota resident.  When Picht built a new home

in Minnesota in 2006, her building contractor, Joe Jost, suggested that she use

siding manufactured by Hardie because that siding "looked like wood but did

not require any maintenance" and "was protected by a fifty-year warranty."

(Civ. File No. 11-958 [Docket No. 79] Picht Decl. ¶¶ 2-3.)  Based on Jost's

recommendation, Picht visited Morris Lumber, where she looked at samples of

Hardie siding and saw Hardie advertising.  (Picht Decl. ¶ 4.)  The advertising

stated that the siding was durable and covered by a 50-year warranty.  (Picht

Decl. ¶ 5; Picht Decl., Ex. A.)  Picht testified that the only representation that she

saw from Hardie before purchasing the siding was a statement that the siding

came with a 50-year warranty.  ([Docket No. 81] Murphy Reply Decl., Ex. B, Picht

Dep. 67-68.)   Picht chose to purchase the Hardie siding because it looked like

wood and she believed that it was "a durable product with a fifty-year warranty." (Picht Decl. ¶ 6.)

Picht chose a mahogany stain for the siding, and it was installed on her house on or before September 25, 2006. (Moriarity Aff., Ex. 1, Picht Response to Hardie Interrogatory No. 2; Moriarity Aff., Ex. 2, Picht Dep. 58.) Hardie sold the siding as unfinished to Building Products, Inc. ("BPI"), an independent distributor of building products. (Duke Decl. ¶¶ 3-4.) BPI hired Midwest Factory Finishes to apply a semi-transparent stain manufactured by third-party Duckback Products ("Duckback"). (Enoka Aff., Ex. 1 at 13, 15, 19; Duke Aff. ¶ 4.) BPI then sold the siding to Morris Lumber. (Duke Aff. ¶ 5; Enoka Aff., Ex. 1 at 15.)

In the spring of 2007, Picht noticed that the siding's finish was starting to peel and she contacted Jost, who contacted Morris Lumber. (Picht Decl. ¶ 6.) The lumberyard put Picht in touch with Jamie Duke, a representative from BPI, and John Cooper, a representative of Duckback. (Id. ¶ 7; Duke Decl. ¶¶ 2, 6.) Later in the spring of 2007, Duke and Cooper visited Picht's house. (Picht Decl. ¶ 7.) Cooper gave Picht a copy of James Hardie's Limited Warranty. (Id.) Picht

avers that this was the first time that she saw the language of the Limited Warranty. (Id. ¶ 8.)

As a result of the visit, Duke sent a worker to touch up the stain on Picht's siding at some point in 2007. (Picht Decl. ¶ 9.) When Picht told Duke that the touch-up work was unsatisfactory and blotchy, he stated that he would return again in the spring of 2008. (Id. ¶ 9.) During the fall of 2007 or the spring of 2008, Picht noticed that the siding was also warping and shrinking. (Picht Dep. 126.) During the spring of 2008, Picht asked Duke for a warranty claim form, and Duke provided Picht with a warranty claim form from Duckback, but not from Hardie. (Id. 167-68.) At that time, Picht knew that Duke worked for BPI, and she thought that Duckback was the "the warranty company" which was responsible for fixing the problems with her siding. (Id. 167-68, 207-08.)

On June 9, 2008, Picht submitted the warranty claim to Duckback. (Enoka Aff., Ex. 1 at 13.) On June 19, 2008, Duckback informed Picht that there were

> building practice issues that must be fixed prior to any coating resolution. I have included a copy of the James Hardie Installation Instructions. A few issues noticed were lack of caulking and lack of kick out flashing.

> Once the building practice issues have been fixed, Midwest Factory Finishes, BPI and Duckback will work together to supply coating for the minimal peeling and a few re ran boards.

(Enoka Aff., Ex. 1 at 15.)  On August 7, 2008, Picht told Duckback that the

building practices issues had been fixed and she had received 20 new siding

boards from BPI, but the boards were darker than the existing siding.  (Enoka

Aff., Ex. 1 at 19.)

On August 13, 2008, Duckback stated:

The initial building practice issues allowed moisture to enter the
boards resulting in the underlying substrate to give way resulting in
cracking and peeling.  Because of the initial problems the boards
may continue to give way.

Duckback offered to apply a solid-color finish to all of her siding.  (Enoka Aff.,

Ex. 1 at 19.)

On or about August 19, 2008, Picht retrieved documents related to her

siding claims from an attorney she had consulted.  (Murphy Decl., Ex. B, Picht.

Dep. 183.)  A letter dated August 19, 2008 accompanied the return of the

documents.  (Murphy Decl., Ex. A.)  In the letter, Picht's attorney informed her

that the statute of limitations "to bring an actual lawsuit for this siding claim will

run around March 1, 2009."  (Id.)  The letter stated that Picht "[had] been fully

advised that if [she] ever want[ed] to make a legal claim for this siding issue it

must be sued out prior to March 1, 2009."  (Id.)  Picht testified that, in August

147

2008, she understood that the deadline for her to bring her lawsuit against Hardie was March 1, 2009, because she had discovered problems with her siding around March 1, 2007.  (Murphy Decl., Ex. B, Picht. Dep. 183-84.)

On August 21, 2008, Picht submitted a Consumer Complaint regarding Hardie to the Minnesota Attorney General's Office.  ([Docket No. 81] Murphy Decl., Ex. D.)  Picht asserted that the siding was "clearly a defective product" and stated that she wanted Hardie to provide the "[f]ull cost of new siding, removal of old product, including labor, house wrap and all materials needed."  (Id.)

On November 3, 2008, in response to an inquiry by the Minnesota Attorney General, counsel for Hardie wrote that Picht's "complaint against James Hardie [was] unfounded" because its Limited Warranty did not apply to Picht's claim due to its exclusion of coverage for stains or coatings not applied by Hardie or an affiliate.  (Murphy Decl., Ex. E.)  The Minnesota Attorney General's Office relayed Hardie's response to Picht in a letter dated November 5, 2008. (Id.)

On March 30, 2011, Picht commenced an action against Hardie in Minnesota state court.  [Docket No. 1]  Hardie removed the matter to this Court. In her Amended Complaint [Docket No. 16], Picht set out seven causes of action:

Count 1: Breach of Express Warranty; Count 2: Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose; Count 3: Unlawful Trade Practices: Count 4: False Advertising; Count 5: Negligence; Count 6: Negligent Failure to Warn; and Count 7: Unjust Enrichment.   On July 5, 2011, Hardie moved for summary judgment on all claims against it based on, among other things, the statute of limitations.

On August 9, 2013, Plaintiffs filed the ACC, which included Picht as a Plaintiff.

### B.    Choice of Law

The Court applies Minnesota law because, under Minnesota's "significant contacts test," <u>Nodak Mut. Ins. v. Am. Family Mut. Ins.</u>, 604 N.W.2d 91, 94, 96 (Minn. 2000), Picht is a Minnesota resident, the Hardieplank was installed on a structure in Minnesota, and the alleged injuries occurred in Minnesota.

### C.    Summary of the Motion

Based on the ACC, Picht asserts the following claims against Hardie: Count 1: Breach of Express Warranty; Count 2: Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose; Count 3: Negligence; Count 4: Declaratory and Injunctive Relief; Count 5: Violation of the California UCL; Count 7: Violation of the Minnesota Unlawful Trade Practices Act; and Count 8:

149

Violation of the Minnesota False Statements in Advertising Act.  Hardie seeks

summary judgment in its favor on all claims.

### D.    Statute of Limitations

#### 1.    Applicability of the Two-Year Statute of Limitations

The two-year statute of limitations applies to all of Picht's Minnesota

claims because Picht's claims, like Bowers' claims, seek "to recover damages for

any injury to property . . . arising out of the defective and unsafe condition of an

improvement to real property."  Minn. Stat. § 541.051, subd.1.  Picht alleges that

Hardieplank has left her home insecure and vulnerable to invasion by the

elements.  Her Amended Complaint alleged that the siding was both "defective

and unsafe" and that it "allow[s] water to penetrate into the structure."

(Amended Compl. ¶¶ 8, 122.)  The current operative complaint, the ACC, asserts:

"Because of the failure of the Siding, water penetrated into Ms. Picht's home,

damaging the underlying structure.  (ACC ¶ 60.)  The ACC further alleges that

the siding "is susceptible to premature failure, causing damage to the underlying

structures and property of Plaintiff by allowing water and moisture to penetrate

into the structure."  (ACC ¶ 6.  See also id. ¶¶ 34 (siding "allows water and

moisture to penetrate into the structure, thereby causing damage to the

underlying structure and other adjoining property"), 123 ("Due to gaps and

150

deterioration in the Siding, the underlayment of Plaintiffs' home was exposed to the elements, risking further damage to the underlying structure.").)  Thus, for the reasons explained with respect to Plaintiff Bowers, the two-year statute of limitations applies to Picht's Minnesota claims.

### 2.    Accrual

At the very latest, Picht was aware of her claims against Hardie when she received a letter from the Minnesota Attorney General informing her that Hardie denied liability for the alleged defects in her home's siding.  Picht received that letter in November 2008.  By this time, she had observed the defects in her siding and knew that Hardie would not address those alleged defects and denied liability under the Limited Warranty.  Thus, Picht's claims had all accrued by November 2008, when she had discovered her "injury," Minn. Stat. § 541.051, subd.1 (non-express warranty claims) and when she also discovered Hardie's "breach," id., subd. 4.

### 3.    Equitable Estoppel or Tolling

Tolling based on fraudulent concealment or estoppel does not apply.  Picht discovered the alleged defect affecting her siding well over two years before she filed this action.  Picht has stated that her siding began peeling as early as the

spring of 2007.  In any event, in November 2008, she received notice through the

Minnesota Attorney General's Office that Hardie's position was that it was not

responsible for the problems with her siding.  Picht has alleged no conduct after

that date by Hardie (or anybody else) which could have fraudulently concealed

the alleged defects in the siding or Picht's cause of action based on such defects.

Additionally, in August 2008, Picht was informed by an attorney that she needed

to file suit by March 2009, and Picht testified that she understood that this was

the deadline for her to file a lawsuit against Hardie based on defects in the

siding.

Picht argues that there remains a question fact as to whether the

representations of BPI employees acting as James Hardie's actual or constructive

agents induced her to delay filing her lawsuit and should serve to estop Hardie

from asserting a statute of limitations defense.  "Under the doctrine of equitable

estoppel, if a buyer delays filing suit [on a warranty claim] as a result of

reasonable and detrimental reliance on a seller's assurances it will repair the

defective goods, the limitations period is tolled during that period of delay."

Highway Sales, Inc. v. Blue Bird Corp., 559 F.3d 782, 789 (8th Cir. 2009).  Picht

has not pointed to evidence from which a factfinder could determine that BPI or

Duke were actual or constructive agents of Hardie. And Duke provided Picht with a Duckback warranty claim form, not a Hardie claim form. In any event, even if Duke's conduct were attributable to Hardie and induced Picht to delay filing suit, the statute of limitations bars her claims. Duckback rejected Picht's warranty claim in August 2008. That same month, Picht's attorney informed her that the statute of limitations on her claim would run in less than a year. In November 2008, Hardie made clear that it did not believe that its warranty covered her claims. Picht has pointed to no evidence that Hardie, Duke, or anyone else made any additional representations to her after November 2008 or that such representations caused her to continue to delay the filing of her lawsuit. Thus, even if estoppel applied, the start of two year limitation period would not be tolled after November 2008 at the very latest, meaning that Picht was required to bring her action in November 2010. Picht did not file her lawsuit until March 2011.

### E.    Count 5: California Unfair Competition Law

Hardie is entitled to summary judgment on Count 5. Assuming without deciding that the UCL applies, Picht's UCL claim fails. First, statements by Picht's building contractor are not actionable because Hardie is not liable for statements made by unrelated third parties. <u>See, e.g.</u>, <u>Emery v. Visa Int'l Serv.</u>

Ass'n, 116 Cal. Rptr. 2d 25, 33 (Cal. Ct. App. 2002). Second, Picht cannot point to

actionable representations by Hardie. Picht testified that the only representation

that she received from Hardie before purchasing her siding was that the siding

carried a 50-year warranty. As the Court has previously explained, this

representation was true and there is no support for Plaintiffs' signal theory. As

for Picht's more recent claim that she read a brochure that Hardie was durable,

"[g]eneralized, vague, and unspecified assertions constitute 'mere puffery' upon

which a reasonable consumer could not rely, and hence are not actionable [under

the UCL]." Azoulai v. BMW of N. Am. LLC, No. 16-CV-00589-BLF, 2017 WL

1354781, at *8 (N.D. Cal. Apr. 13, 2017) (citations omitted). Thus, no UCL claim

based on an alleged misrepresentation can survive. Finally, Picht points to no

facts to support an unfair practices claim. Picht did not file a warranty claim

with Hardie and, as the Court has held, the Limited Warranty does not provide

coverage for design defects.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.      Defendant's Motion for Summary Judgment (Swiencki) [MDL
        Docket No. 306] [Civil File No. 12-1392 Docket No. 36] is
        **GRANTED** and Plaintiff Swiencki's claims are **DISMISSED
        WITH PREJUDICE**.

154

2. Defendant's Motion for Summary Judgment (Kavianpour) [MDL Docket No. 311] [Civil File No. 12-2268 Docket No. 24] is **GRANTED** and Plaintiff Kavianpour's claims are **DISMISSED WITH PREJUDICE**.

3. Defendant's Motion for Summary Judgment (Susan S. Buchanan Personal Residence Trust) [MDL Docket No. 316] [Civil File No. 12-1393 Docket No. 33] is **GRANTED** and Plaintiff Susan S. Buchanan Personal Residence Trust's claims are **DISMISSED WITH PREJUDICE**.

4. Defendant's Motion for Summary Judgment (Dillingham) [MDL Docket No. 320] [Civil File No. 12-1496 Docket No. 26] is **GRANTED** and Plaintiff Dillingham's claims are **DISMISSED WITH PREJUDICE**.

5. Defendant's Motion for Summary Judgment (Fenwick) [MDL Docket No. 324] [Civil File No. 12-1391 Docket No. 32] is **GRANTED** and Plaintiff Fenwick's claims are **DISMISSED WITH PREJUDICE**.

6. Defendant's Motion for Summary Judgment (Brown, Kostos, Treece) [MDL Docket No. 328] [Civil File No. 12-2817 Docket No. 28] [Civil File No. 12-1497 Docket No. 42] [Civil File No. 12-1669 Docket No. 30] is **GRANTED** and Plaintiffs Brown's, Kostos's and Treece's clams are **DISMISSED WITH PREJUDICE**.

7. Defendant's Motion for Summary Judgment (Bethel) [MDL Docket No. 333] [Civil File No. 12-2728 Docket No. 26] is **GRANTED** and Plaintiff Bethel's claims are **DISMISSED WITH PREJUDICE**.

8. Defendant's Motion for Summary Judgment (Bowers) [MDL Docket No. 337] [Civil File No. 12-727 Docket No. 36] is

**GRANTED** and Plaintiff Bowers' claims are **DISMISSED WITH PREJUDICE**.

9.    Defendant's Motion for Summary Judgment (Hernandez) [MDL Docket No. 341] [Civil File No. 14-4655 Docket No. 41] is **GRANTED** and Plaintiff Hernandez's claims are **DISMISSED WITH PREJUDICE**.

10.    Defendant's Motion for Summary Judgment (Angelici) [MDL Docket No. 346] [Civil File No. 14-285 Docket No. 46] is **GRANTED** and Plaintiffs Angelicis' claims are **DISMISSED WITH PREJUDICE**.

11.    Defendant's Combined Motion for Summary Judgment and to Dismiss under Rule 9(b) (Picht) [(Civil File No. 11-958 Docket No. 25] is **GRANTED** and Plaintiff Picht's claims are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 2, 2018                    s/ Michael J. Davis
                                           Michael J. Davis
                                           United States District Court

156